Marshall BURKES, Plaintiff-Respondent-Petitioner,

v.

James R. KLAUSER, Eugene G. Martin, Maureen J. Busby, Richard H. Lillie and Nicholas Hurtgen, Defendants-Petitioners-Respondents-Petitioners, †

Edward E. HALES, Defendant-Co-Petitioner-Respondent-Petitioner,

M. William GERRARD, Defendant-Third Party Plaintiff,

ACCELERATION NATIONAL INSURANCE COMPANY and Rural Mutual Insurance Company, Third Party Defendants. [Case No. 92–2308.]

Marshall BURKES, Plaintiff-Respondent,

v.

James R. KLAUSER, Eugene G. Martin, Edward E. Hales, Maureen J. Busby, Richard H. Lillie and Nicholas Hurtgen, Defendants-Appellants-Petitioners,

M. William GERRARD, Defendant-Third Party Plaintiff-Respondent,

ACCELERATION NATIONAL INSURANCE COMPANY and Rural Mutual Insurance Company, Third Party Defendants-Respondents. [Case No. 92–2578.]

Supreme Court

†Motion for reconsideration denied September 21, 1994. DAY and GESKE, JJ., took no part.

*Nos. 92–2308, 92–2578. Oral argument March 2, 1994.—Decided June 24, 1994.*

(Also reported in 517 N.W.2d 503.)

315

For the defendants-appellants-petitioners in 92–2578 and for the defendants-petitioners-respondents in 92–2308 there were briefs by *Bruce A. Olsen,* assistant attorney general, *Robert A. Selk,* acting attorney general; *Waltraud A. Arts* and *Quarles & Brady,* Madison; *Terry E. Johnson* and *Peterson, Johnson & Murray,* Milwaukee; and for the defendant-appellant-petitioner in 92–2578 and for the defendant-co-petitioner-respondent in 92–2308 there were briefs by *T. Christopher Kelly,* Madison and oral argument by *Bruce A. Olsen.*

For the plaintiff-respondent in 92–2578 and the plaintiff-respondent-petitioner in 92–2308 there was a brief by *Steven J. Schooler* and *Lawton & Cates, S.C.,* Madison and *Robert J. Gingras* and *Gingras Law Offices,* Madison and oral argument by *Steven J. Schooler.*

SHIRLEY S. ABRAHAMSON, J. This is a review of an unpublished decision of the court of appeals, filed March 10, 1993. The court of appeals modified an order of the circuit court for Dane County, P. Charles Jones, circuit judge, and denied the defendants' motions for summary judgment and for dismissal of the claims against them.

Plaintiff Marshall Burkes, a former executive director of the State of Wisconsin Investment Board, commenced this 42 U.S.C. sec. 1983[1] action against defendants James R. Klauser, Eugene G. Martin, Edward E. Hales, Maureen J. Busby, Richard H. Lillie, and P. Nicholas Hurtgen,[2] members of the board of

---

[1] 42 U.S.C. sec. 1983 provides:

Every person who, under color of any statute ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding or redress.

[2] Defendants James R. Klauser, Eugene G. Martin, Edward E. Hales, Maureen J. Busby, and Richard H. Lillie are members of the eight-person board of trustees that governs the State of Wisconsin Investment Board. James R. Klauser is a member of the Investment Board as a result of his position as the secretary of the Department of Administration. The statute provides that the secretary may appoint a designee to sit as a trustee. Defen-

trustees of the Investment Board, in their individual and official capacities. The plaintiff claimed that the defendants discharged him because he held meetings with the State Auditor and Attorney General, and that this discharge was in violation of his First Amendment right to free speech. The circuit court denied the defendants' motion for summary judgment, holding that the defendants failed to make a *prima facie* showing of qualified immunity from suit.

The court of appeals concluded, as did the circuit court, that the question of qualified immunity is a threshold issue which should be resolved before trial. The court of appeals, however, remanded the cause to the circuit court "to hold an evidentiary hearing . . . to resolve genuine issues of fact as to what the [defendants] knew of Burkes's 'speech' to the state auditor and the attorney general when they discharged him" and to decide the qualified immunity issue as to each defendant. The court of appeals also concluded that the official capacity claim could not be dismissed without reaching the merits of the qualified immunity defense. We granted the defendants' petition for review.

Two issues are raised on review. The first is whether the action should be dismissed because the defendants are entitled to qualified immunity. In this case, the defendants would not be entitled to qualified immunity from suit if in June 1989 the defendants knew or should have known that discharging of the plaintiff from his position as executive director of the Investment Board following his conversations with the State Auditor and the Attorney General would deprive him of clearly established constitutional rights. We

---

dant Hurtgen, an employee of the Department of Administration, sometimes sits as trustee as the secretary's designee. Section 15.76(1), Stats. 1991–92.

conclude that, on the basis of the facts presented up to this point in the proceedings, the defendants are not entitled to qualified immunity. Accordingly we affirm that part of the court of appeals' decision denying the defendants' motion for summary judgment on the grounds of qualified immunity. Unlike the court of appeals, however, we do not remand the cause to the circuit court for factfinding with respect to the qualified immunity defense. We remand the matter to the circuit court for further proceedings relating to a trial on the merits.

The second issue is whether the plaintiff may proceed with his claims against the defendants in their official capacities. We hold that he may not; he has failed to show that the defendants were acting pursuant to policy and custom in terminating his employment. Accordingly we reverse that part of the court of appeals' decision denying the defendants' motion for summary judgment on the claim against the defendants in their official capacities. On remand, the circuit court should dismiss these claims.

## I.

This case has not been tried. It comes to us on a record of pleadings, depositions and affidavits documenting some of the events that occurred during the plaintiff's employment with the Investment Board. The record is replete with disputed assertions and myriad complex facts. We summarize here only those facts essential to an understanding of the issues; we will furnish additional facts in our discussion of the legal arguments.

The State of Wisconsin Investment Board manages state funds, including over $20 billion in public monies, mostly pension and retirement funds for public

employees. The Investment Board is governed by eight trustees who oversee the investment of assets and establish policy as to personnel and investments. Sections 15.76(1), 25.15(1), 25.156(1), Stats. 1991–92. Marshall Burkes, the plaintiff, was hired as executive director of the Investment Board on August 20, 1987. The trustees of the Investment Board terminated his employment on June 23, 1989.

As executive director of the Investment Board, the plaintiff was responsible for the management and administration of the investments and for performance of executive and administrative functions according to the policies, principles and directives adopted by the trustees. Sections 25.156(2), 25.16(2), Stats. 1991–92.

During his tenure as executive director the plaintiff was never formally disciplined, reprimanded or warned in writing of any weaknesses or defects in his job performance. In 1988, at the end of his first year as executive director of the Investment Board, he received a $21,000 increase in his $90,000 salary, plus a $15,000 bonus for his performance in 1987–88. In October 1988, the plaintiff's performance was favorably reviewed in writing and characterized as "outstanding." The chairperson of the Investment Board wrote that the plaintiff had "shown outstanding ability and willingness to tackle tough issues, such as personnel deficiencies. . . ."

The parties dispute whether the plaintiff was ever warned that his job was in jeopardy. Although the plaintiff asserts that he was not, the defendants claim that in late 1988 and early 1989 the plaintiff was informally warned that his job was at risk. The defendants also claim that various trustees spoke privately with the plaintiff, urging him to change the pattern of his behavior. The defendants further assert that, without

the plaintiff's knowledge, several members of the staff of the Investment Board had complained to some of the trustees about the plaintiff and that, again without the plaintiff's knowledge, the trustees were compiling information critical of the plaintiff's job performance.

On several occasions in late 1988 and early 1989, the plaintiff proposed a series of agricultural loans to the Investment Board. The undisputed evidence is that the trustees received this "Agrivest" proposal with reservations and a lack of enthusiasm. The defendants assert that the poor professional judgment shown by this proposal caused the trustees' confidence in the plaintiff to erode.

In spring of 1989, the plaintiff expressed concern to the Investment Board about a significant loan to The Company Store[3] and a proposed investment in a real estate development in Santa Clarita, California. Both projects had been brought to the Investment Board by William Gerrard, a Wisconsin businessman with interests in real estate brokerage. The trustees initially rejected the Santa Clarita submission at the May 1989 meeting. After a request from William Gerrard, the trustees agreed to hear a second presentation about the development, and at the regular June 1989 meeting the trustees considered and rejected a reformulated version of the proposal.

---

[3] In 1987 and 1988, the Investment Board invested $10 million in The Company Store. In February 1989, The Company Store posted a $6 million loss and faced bankruptcy or buyout. In the first half of 1989 negotiations about the financial situation of The Company Store were in process. According to the affidavits of the defendants, some members of the Investment Board's staff were dissatisfied with the plaintiff's performance in dealing with The Company Store.

The plaintiff claims that during this time he voiced concerns to some trustees about Gerrard's apparent influence with trustees. According to the plaintiff's calculations, Gerrard or businesses in which Gerrard held substantial interests would receive finder's fees in excess of $300,000 from loan recipients in return for his bringing their investment projects to the Investment Board. The defendants dispute the plaintiff's calculations.

In June 1989, the plaintiff proposed that the trustees adopt a policy requiring public disclosure of all finder's fees paid by recipients of board loans in the real estate division. This proposal was greeted with disfavor by the trustees; the motion for disclosure of fees died for lack of a second.

On June 19, 1989, the plaintiff, accompanied by acting legal counsel for the Investment Board, met with State Auditor Dale Cattanach and his deputy, and then with Attorney General Donald Hanaway and Deputy Attorney General Mark Musolf. The State Auditor directs the operations of the Legislative Audit Bureau that conducts postaudits of the accounts of government boards and agencies to assure that all financial transactions have been made in a legal and proper manner. Section 13.94, Stats. 1991–92. The Attorney General is head of the Department of Justice which, among other duties, furnishes legal services to the Investment Board. Section 165.25(4)(a), Stats. 1991–92.

The plaintiff asserts that at each of these meetings he discussed his concerns about finder's fees, influence peddling (mentioning William Gerrard by name) and staff intimidation. The plaintiff left with each authority a list of concerns which he thought the authorities

322

should address,[4] and a chart detailing finder's fees paid or payable to brokers. The chart (but not the list of concerns) had been prepared for and previously submitted to the trustees.

The plaintiff then attempted to communicate with each of the trustees to discuss these meetings and successfully contacted some of them. According to the plaintiff, he told at least one of the defendants that these meetings were held because of fee issues and influence peddling.

The defendants acknowledge that, prior to discharging the plaintiff, they were aware of these meetings and that the plaintiff had expressed concerns at the meetings about "influence" and about finder's fees. However, the defendants deny knowledge of the plaintiff's list of concerns and of his leaving the finder's fee chart with these public officials.

On June 20, 1989, the trustees of the Investment Board met in a special closed session meeting. The plaintiff was not present; he was at a seminar outside the state. At this Investment Board meeting, the trustees reviewed allegations of the plaintiff's mismanagement, including statements from staff members critical of his performance. According to one staff member, there was also a group discussion of the plaintiff's meetings with the State Auditor and Attorney General.

At the June 20 meeting, the trustees relieved the plaintiff of his responsibilities as executive director. The plaintiff was informed of the action by telephone on June 21, and by telegram on June 22. He was also

---

[4] The concerns were about influence peddling and the possible consequences of failure to disclose finder's fees and are set forth at note 10.

notified of a special meeting of the trustees to consider his removal as executive director.

At the special meeting, on June 23, the plaintiff was discharged as executive director by unanimous vote of the eight trustees. The affidavit of each trustee asserts that his or her vote to terminate the plaintiff was based on reasons other than the plaintiff's conversations with the State Auditor and Attorney General.

## II.

We begin with an overview of three aspects of the law applicable to this section 1983 claim against the defendants in their individual capacities: (A) the elements of a public official's claim for interference with exercise of free speech, (B) the defense of qualified immunity, and (C) the rules applicable to review of an order denying summary judgment.

## A.

When an employee brings a section 1983 claim against public officials in their individual capacities claiming impermissible discipline for exercising his freedom of speech, the court undertakes a four-step analysis as explicated in *Barnhill v. Board of Regents,* 166 Wis. 2d 395, 417, 479 N.W.2d 917 (1992):

1. The court must first determine whether a public employee's speech touches upon a matter of public concern. *Connick v. Myers,* 461 U.S. 138, 147–48 (1983).

2. If the court concludes that the employee was speaking on a matter of public concern, the court must then balance the employee's interests in making the statement against the public employer's interest in the effective and efficient fulfillment of its responsibilities

to the public. *Pickering v. Board of Education,* 391 U.S. 563, 568 (1968).

3. Assuming that both previous elements are found in favor of the employee, the employee must then prove that the protected speech "was a 'motivating factor' " in that detrimental employment decision. *Mt. Healthy City School District v. Doyle,* 429 U.S. 274, 287 (1977).

4. If the employee proves the motivating factor, the burden then shifts to the public officials to show by a preponderance of the evidence that they would have reached the same decision in the absence of the protected speech. *Mt. Healthy City School District v. Doyle,* 429 U.S. 274, 287 (1977).

The first two steps in the analysis of the employee's claim involve questions of law for the court. If the court determines that the employee has not satisfied the *Connick* and *Pickering* steps, the speech is not protected and the employee's claim is dismissed.

The second two steps involve questions of fact for the factfinder. As a result, this court will address only the first two steps. If the plaintiff's case survives those analyses, the second two steps will be determined at trial.

### B.

An analysis of qualified immunity presumes that the employee has made a sufficient showing to satisfy the *Connick* and *Pickering* steps. When government officials abuse their office, an action for damages against the officials in their individual capacities may be the only realistic means for vindicating a constitutional right. On the other hand, permitting lawsuits against government officials in their individual capacities may unduly hamper officials in the discharge of

their duties. *Harlow v. Fitzgerald,* 457 U.S. 800, 807, 814 (1982). The cases have accommodated these competing concerns by providing officials sued in their individual capacities with qualified immunity.

The difficulty, however, is in determining when a particular action is entitled to qualified immunity and when one is not. Government officials are not protected from suit for civil damages (that is, they do not have the defense of qualified immunity) when at the time they acted they knew or should have known that the action would deprive the employee of a constitutional right. The relevant inquiry, then, is whether a reasonable state official could have believed his or her act was constitutional "in light of clearly established law and the information [he or she] possessed" at the time of the official's action. *Anderson v. Creighton,* 483 U.S. 635, 641 (1987).[5]

The standard of objective legal reasonableness used in determining qualified immunity requires the court to focus on the degree to which clearly established case law gives guidance to officials faced with a particular fact situation. *Barnhill v. Board of Regents,* 166 Wis. 2d 395, 407–08, 479 N.W.2d 917 (1992). In determining whether it is objectively legally reasonable for public officials to conclude that a particular decision was lawful, we must examine the information

[5] "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982), quoted with approval, *Wyatt v. Cole,* — U.S. —, 112 S.Ct. 1827, 1832 (1992).

they possessed in light of the established case law at the time. In this case, the question is whether, in June 1989, the defendants knew or should have known that a decision to discharge the plaintiff for certain communications with the Attorney General and the State Auditor would be unlawful. *Anderson v. Creighton,* 483 U.S. 635, 639–640 (1987).

Qualified immunity is an affirmative defense. If the public officials are immune from suit, there is no determination of liability on the merits. Qualified immunity forestalls the lawsuit from proceeding. It is a question of law for the court. *Barnhill v. Board of Regents,* 166 Wis. 2d 395, 406, 479 N.W.2d 917 (1992). Thus it is appropriately addressed and resolved at the summary judgment stage before extensive measures are taken to defend the public officials. *Barnhill v. Board of Regents,* 166 Wis. 2d 395, 415, 479 N.W.2d 917 (1992) (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985).

## C.

This case comes before us as a review of a denial of summary judgment on the plaintiff's claim against the defendants in their individual capacities. We review *de novo* the grant or denial of a summary judgment motion. *Green Springs Farm v. Kersten,* 136 Wis. 2d 304, 315–317, 401 N.W.2d 816 (1987). Summary judgment is governed by sec. 802.08, Stats. 1991–92, and the general procedure for review has been explained by the courts in numerous cases. *See, e.g., Grams v. Boss,* 97 Wis. 2d 332, 338–39, 294 N.W.2d 473 (1980). The application of this methodology to defendants' claims of

qualified immunity in a section 1983 action is not as well chronicled by the Wisconsin courts.

When a court decides a motion for summary judgment based on the defense of qualified immunity, it must determine from the complaint whether the plaintiff has alleged facts establishing a claim for a violation of a clearly established constitutional right. *Baxter v. DNR,* 165 Wis. 2d 298, 303, 477 N.W.2d 648 (Ct. App. 1991); *Rakovich v. Wade,* 850 F.2d 1179, 1210, n.22 (7th Cir. 1988) (en banc), *cert. denied,* 488 U.S. 968 (1988); *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985). Second, the court must determine whether the defendants are entitled to the defense of qualified immunity from suit.

In a summary judgment proceeding, the court reviews the undisputed facts in the light most favorable to the party opposing summary judgment (here the plaintiff) and draws reasonable inferences in that party's favor. *Green v. Carlson,* 826 F.2d 647, 650 (7th Cir. 1987). If such a reading shows as a matter of law that the defendant's conduct violated no clearly established legal norms, then the summary judgment should be granted. However, if there are issues of disputed fact upon which immunity turns, or if it is clear that the defendants' conduct did violate clearly established norms, the case should proceed to trial. *Baxter v. DNR,* 165 Wis. 2d 298, 303–04, 477 N.W.2d 648 (Ct. App. 1991); *Harlow v. Fitzgerald* 457 U.S. 800, 805 (1982); *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985); *Green v. Carlson,* 826 F.2d 647, 652 (7th Cir. 1987).

As noted above, qualified immunity is immunity from suit; the primary benefit of such immunity is to

shield public officials from protracted and potentially wasteful litigation. *Harlow v. Fitzgerald,* 457 U.S. 800, 817–818 (1982). This principal benefit, then, is lost if the case proceeds to trial. *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985). Nevertheless the denial of summary judgment does not preclude a party from raising at trial issues considered in the summary judgment proceeding. *Anderson v. Creighton,* 483 U.S. 635, 641 (1987); *Green v. Carlson,* 826 F.2d 647, 652, n.4 (7th Cir. 1987).

The court of appeals determined that there were genuine issues of material fact relating to the defendants' knowledge of the content of the plaintiff's speech when they discharged him. Concluding that additional factfinding should precede a ruling on qualified immunity, the court of appeals remanded the case to the circuit court for that purpose. The court of appeals erred. Remanding the case for such factfinding before trial contravenes the practice adopted by other courts in this type of case. To follow the court of appeals' approach would invite repeated trial court proceedings and appeals. If issues of fact preclude granting the shelter of qualified immunity, the case should proceed to trial on the merits. *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985).

On review the defendants assert that their immunity does not turn on any disputed facts. The plaintiff appears to assert on the one hand that the evidence of his speech and the defendants' knowledge of his speech "is sufficient to establish First Amendment protection pursuant to clearly established law," Plaintiff's brief at 22, and on the other hand that "disputed material factual issues" about the defendants' knowledge "require resolution by a full trial on the merits." Plaintiff's brief

329

at 22. We shall explore the question of the defendants' knowledge in our discussion of the applicable law.

## III.

As we explained above, in a section 1983 action such as the one in this case, a court must determine first whether a public employee's speech touches upon a matter of public concern. *Connick v. Myers,* 461 U.S. 138, 147–48 (1983). Second, the court must determine whether the employee's interests in making the statement outweigh the public employer's interests in the effective and efficient fulfillment of its responsibilities to the public. *Pickering v. Board of Education,* 391 U.S. 563, 568 (1968).

Before a court considers a claim of qualified immunity the plaintiff must have made a sufficient showing satisfying these two steps. For the plaintiff in this case to defeat the defense of qualified immunity at this stage, the court must conclude that the defendants reasonably believed on the basis of clearly established law at the time (a) that the plaintiff's speech to the State Auditor and the Attorney General was on a matter of public concern and therefore was protected by the First Amendment (the *Connick* test), and (b) that the plaintiff's speech was not overridden by the Investment Board's interest in the effective and efficient fulfillment of its responsibilities to the public (the *Pickering* test). *Connick v. Myers,* 461 U.S. 138 (1983); *Pickering v. Board of Education,* 391 U.S. 563 (1968); *Barnhill v. Board of Regents,* 166 Wis. 2d 395, 410, 479 N.W.2d 917 (1992).

To determine whether the law was clearly established at the time of the defendants' alleged violation, a court cannot look at the law in the abstract. Rather, the

test for qualified immunity is whether the law was clear in relation to the specific facts confronting the defendants at the time of their action. *Anderson v. Creighton,* 483 U.S. 635, 639–40, n.2 (1987); *Green v. Carlson,* 826 F.2d 647, 649 (7th Cir. 1987). The plaintiff's claimed right must be sufficiently particularized to put the defendants on notice of analogous case law indicating that their conduct is unlawful; it cannot be characterized in such general terms that all cases are applicable or in such great detail that each case is unique. *Anderson v. Creighton,* 483 U.S. 635, 640 (1987).[6]

The inquiry is necessarily fact-specific and focuses on the circumstances with which the official is confronted. Cases involving the exact fact pattern of the case at bar are not necessary; case law in closely analogous areas permits a court to determine whether the constitutional right was clearly established at the time of the alleged violation. *Anderson v. Creighton,* 483 U.S. 635, 639 (1987); *Conner v. Reinhard,* 847 F.2d 384, 388 (7th Cir.), *cert. denied* 488 U.S. 856 (1988); *Barn-*

___

[6] The United States Supreme Court has provided courts with guidance in making the determination whether the law was clearly established: "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton,* 483 U.S. 635, 640 (1987) (citations omitted).

*hill v. Board of Regents,* 166 Wis. 2d 395, 409, 479 N.W.2d 917 (1992).[7]

We turn first to the *Connick* public concern test and then to the *Pickering* balancing test. With respect to each test we set forth additional facts as necessary to formulate the plaintiff's claimed right, and we examine the applicable law to determine whether it was clearly established that the defendants' conduct violated a constitutional or statutory right.

## A.

The first step in our *Connick* test analysis is to determine whether the undisputed facts show that the plaintiff's speech was a matter of public concern, a matter in which "debate is vital to informed decisionmaking by the electorate." *Pickering v. Board of Education,* 391 U.S. 563, 571–72 (1968). The second step is to determine whether the defendants knew or had reason to know that the plaintiff's speech was a matter of public concern. *Connick v. Myers,* 461 U.S. 138 (1983).

Neither every matter that transpires within a government office, nor every criticism directed at public officials is a matter of public concern. To determine whether a plaintiff's speech is of public concern we

---

[7] "The plaintiff bears the burden of establishing the existence of the allegedly 'clearly established' constitutional right." *Barnhill v. Board of Regents,* 166 Wis. 2d 395, 409, 470 N.W.2d 917 (1992) (citations omitted). The defendants, as the movants for summary judgment, bear the burden of proving that the facts relevant to the determination of qualified immunity are not disputed. *Green v. Carlson,* 826 F.2d 647, 651 (7th Cir. 1987).

must examine its content, context, and form. *Connick v. Myers,* 461 U.S. 138, 147–148 (1983).

We note that the motivation behind an employee's speech is relevant in determining whether matters of public concern are implicated by the speech. However, motive alone is not dispositive. Even though an employee's private concerns may be implicated, a fragment of the speech touching upon a public concern may satisfy this part of the test. *Berg v. Hunter,* 854 F.2d 238, 242–43 (7th Cir. 1988), *cert. denied* 489 U.S. 1053 (1989); *O'Brien v. Town of Caledonia,* 748 F.2d 403, 407–08 (7th Cir. 1984).

In analyzing the content of the plaintiff's speech in this case, we must first examine the extent of the defendants' knowledge of the plaintiff's speech. We turn initially, as the defendants request, to what the defendants knew about the plaintiff's discussion with the State Auditor and the Attorney General when they discharged him.

The defendants concede that they knew that the plaintiff met with the Auditor and Attorney General and expressed to these officials his concern regarding public disclosure of finder's fees and outside influences on the trustees. The defendants assert that they did not know that the plaintiff left with the officials a list of concerns or a chart about finder's fees. However, the defendants knew the contents of one of the materials, the chart, because the plaintiff had distributed it at a trustees' meeting.

The defendants contend that their limited knowledge of the content of the plaintiff's speech was too vague[8] to serve as a sufficient basis upon which to

---

[8] The defendants refer to *Vukadinovich v. Bartels,* 853 F.2d 1387, 1391 (7th Cir. 1988), for the rule that the First Amend-

conclude that they could have reasonably known that the content of the plaintiff's speech was a matter of public concern. The defendants assert that it would have been reasonable for them to conclude that the plaintiff was seeking support outside the agency for his failed policy on disclosure of finder's fees. According to the defendants, the policy of disclosure is an internal policy of the Investment Board, and thus no more than a matter of private concern to the plaintiff.

The defendants' characterization of the record ignores several salient events, all of which occurred before the plaintiff's meetings with the State Auditor and the Attorney General: (1) Gerrard did receive finder's fees and the plaintiff presented a chart showing fees to the trustees. (2) The plaintiff had presented the fee disclosure issue to the trustees at one of their regular meetings. (3) The plaintiff had raised concerns about fee disclosure and about Gerrard's apparent influence with trustees in conversations with individual trustees. (4) In conversations with one or more trustees, the plaintiff had warned that he might have to consult with the Attorney General. (5) The trustees had taken no action on the plaintiff's concerns.

When this record is viewed in the light most favorable to the plaintiff, the party opposing the summary judgment motion, the only reasonable conclusion is that the defendants knew of the plaintiff's concern about finder's fees and outsider influences on the trust-

ment does not protect a person whose speech is too vague to be construed as raising an issue of public concern. Vukadinovich had resigned as basketball coach and his contract as a teacher was then canceled. He asserted that his statement to the media that "If any body has anything to hide, fine," caused the cancellation of his contract. The court held that the language was too vague to raise an issue of public concern.

ees specifically. On this record, the plaintiff's speech may generally be characterized as attempting to focus the attention of two agencies upon the Investment Board's use, or possible misuse, of public funds. We conclude that reasonable trustees would have perceived the speech in this way.[9]

The defendants dispute this conclusion by relying on the plaintiff's statement to trustees that in the meetings with the Auditor and Attorney General he did not accuse the defendants of any illegality or impropriety. This argument is not persuasive. An accusation of illegality is not required to render statements of apprehension about the use of public monies a matter of public concern; an allegation of waste can rise to that level. *Rookard v. Health and Hospitals Corp.,* 710 F.2d 41 (2d Cir. 1983); *Czurlanis v. Albanese,* 721 F.2d 98, 104 (3d Cir. 1983). Moreover, even if the plaintiff's suspicions were subsequently demonstrated to be incorrect, absent proof of false statements knowingly or

---

[9] The Deputy Attorney General interpreted the plaintiff's limited conversation with him in this manner.

In his deposition, Deputy Attorney General Mark Musolf characterized the plaintiff's communication as follows:

Q: Well, did he indicate that the Investment Board, I'm talking about Mr. Burkes, indicate that the Investment Board decision making was somehow being affected or influenced, a concern with that?
A: Yes, yes he did. . . .
Q: Is there anything else you can recall about it, Mr. Burkes' concerns?
A: Well, he was quite concerned. I do recall that. He was obviously quite sincere about it when he came there . . .
. . .
A: . . . if his allegations were proven true, were they serious? Yes.

Musolf deposition at 29–31.

recklessly made the plaintiff's speech in a matter of public concern is entitled to First Amendment protection. *O'Brien v. Town of Caledonia,* 748 F.2d 403, 407, n.2 (7th Cir. 1984) (citing *Pickering v. Board of Education,* 391 U.S. 563, 574 (1967)).

As we explained, we have examined the plaintiff's statements not in terms of what the plaintiff actually said to the State Auditor and the Attorney General, but in terms of what the defendants concede they knew about the plaintiff's speech and the reasonable inferences to be drawn from the undisputed facts in the record known to the defendants at that time. A recent plurality opinion of the United States Supreme Court involved a discharge of an employee when the employee and the government presented conflicting versions of what the employee actually said. The Court held that a court applying the *Connick* test must consider not only "the facts as the employer thought them to be," but also "the reasonableness of the employer's conclusions." *Waters v. Chambers,* — U.S. —, —, 1994 WL 223511 at p. 10 (U.S.) (May 31, 1994). The plurality opinion apparently requires a government employer, at least in certain circumstances, to make a reasonable investigation to determine what the plaintiff actually said. *Waters v. Chambers,* — U.S. —, 1994 WL 223511 (U.S.) (1994).[10]

If we were to apply the *Waters* plurality opinion to this case, we might conclude that the defendants should have made an inquiry to determine what the plaintiff had actually said. For purposes of deciding this case on the motion for summary judgment, we need not require such an inquiry. We can render a decision on the basis of the defendants' understanding

---

[10] The parties submitted letter briefs on this case upon the court's request.

of what was actually said. Nevertheless, had the defendants inquired of the State Auditor or Attorney General or the acting legal counsel who had accompanied the plaintiff (a straightforward and simple process in this case),[11] they would have discovered the typewritten list of concerns delivered by the plaintiff to the State Auditor and Attorney General (set forth in the margin)[12] and the chart of finder's fees which the

---

[11] The defendants assert that they gave the plaintiff the opportunity to describe his conversations, but his responses were vague.

[12] "1. Is brokerage fee splitting appropriate where two of the three realty firms produce or furnish the prospective investor with *no* written material or representation?

2. How can the quality of representation be determined if a broker provides the prospective investor with *no* written material or representation?

3. How can the amounts of brokerage fees which are being split be evaluated by the prospective investor for each broker if *no* written material or representation has been provided by one of the brokers?

4. If *no* written material or representations are provided to the prospective investor, what is the Investment Board's justification for funding the split payment to that broker?

5. What recourse does the Investment Board and/or Seller have to a broker who may *not* have a written contract with the seller, and does not provide any written representation?

6. Should the Investment Board provide investment funds to cover a brokerage fee when one of the brokers reportedly told the Chairman that his fee is earned by taking the staff to lunch and knowing how to get things past the Trustees?

7. How was the real estate division influenced *not* to use one of the three contracted fiduciary advisors, or an independent third party advisor, to cross-check the three approved Lincoln deals this year?

8. What is the explanation that the last three Board approved projects (of the year's total of four) came from Lincoln's brokers?

9. Is it proper for a lobbyist to have a voice, or influence in Investment Board policy and personnel, while hired as "money finder" for

defendants already possessed. The list of questions makes clear that the plaintiff was speaking about matters of public concern.

Our analysis of the content of the speech requires us to examine next the case law in existence in June 1989 that might cover this fact situation. This court has observed that the "plaintiff bears the burden of establishing the existence of the 'clearly established' constitutional right" by citing cases that are "closely analogous" or "would give a reasonable public official . . . notice that their actions violated a constitutional right." *Barnhill v. Board of Regents,* 166 Wis. 2d 395, 409, 479 N.W.2d 917 (1992). As we have said, the cases need not involve the exact fact pattern of the case at bar, but "case law in a closely analogous area is essen-

a real estate developer (and private placement borrowers in Wisconsin) who became our investment partner in 1986?

10. What recourse does the Investment Board have to the loan finder and/or lobbyist of the Company Store in LaCrosse for the accelerating deterioration of the Company immediately after the loan was made in 1988?

11. What code of conduct in Wisconsin will restrain a broker/lobbyist from demeaning the judgment of certain Investment Directors (who might oppose his influence) to their seniors?

12. How can management and staff be protected from the adversities of "influence peddling and/or intimidation" by broker/lobbyist who mentions close ties with certain Trustees and high officials?

13. Was it appropriate professional conduct for a Trustee to threaten the Executive Director's future with the Investment Board if he continues to recommend full disclosure of finder's fees to the Board?

Your approval or clearance on both the appropriateness of the funding and the amount of the funding for each of the three brokers in each of the three deals this year is requested. Any reduction in funding for brokerage represents a direct cash savings to the Investment Board. Funding of deal number two is scheduled for mid-July and regular due diligence is underway."

tial to permit us to conclude that the constitutional right was clearly established at the time of the alleged violation." *Conner v. Reinhard,* 847 F.2d 384, 388 (7th Cir. 1988) (citations omitted).

Accordingly, the plaintiff calls our attention to a number of cases demonstrating that his claimed First Amendment right to express concern about misuse of public funds is well-recognized and sufficiently particular. We agree with the plaintiff's position. Several courts have identified the misuse of public funds, wastefulness, and inefficiency in managing and operating government entities as matters of public concern. *See, e.g., Berg v. Hunter,* 854 F.2d 238, 242 (7th Cir. 1988), *cert. denied* 489 U.S. 1053 (1989) (a public school teacher's comments about misrepresentations of salaries and unwarranted salary increases were matters of public concern);[13] *Conner v. Reinhard,* 847 F.2d 384, 389 (7th Cir. 1988) (parties concede that public employees' speech about the proper use of public funds is a matter of public concern); *Rookard v. Health and Hospitals Corporation,* 710 F.2d 41 (2d Cir. 1983) (employee's speech about wasteful practices and possible hospital mismanagement was a matter of public concern); *Hamer v. Brown,* 831 F.2d 1398 (8th Cir. 1987) (employee's speech to a committee authorized to investigate a university concerning the expenditure of public funds by the university was a matter of public concern); *Ohse v. Hughes,* 816 F.2d 1144, 1149–52 (7th Cir. 1987), *vacated on other grounds,* 485 U.S. 902 (1988), *remanded,* 863 F.2d 22 (7th Cir. 1988) (public

---

[13] "In an age of ever dwindling public resources, mounting deficits, and demand for greater accountability by public officials, charges of inequitable allocation or misuse of public funds implicates matters of substantial public importance." *Berg v. Hunter,* 854 F.2d 238, 243 (7th Cir. 1988).

employee's letter to public officials calling for investigation and filing of criminal charges for abuse of sick leave, improper use of mileage reimbursement forms, and misappropriation of money budgeted for office expenses was a matter of public concern); *Marohnic v. Walker,* 800 F.2d 613 (6th Cir. 1986) (employee's speech about medicaid fraud in the Mental Retardation Board involves public interest "near its zenith").

Thus the speech at issue in this case satisfies the content prong of the *Connick* test.

■

The defendants contend, and rightly so, that not all speech concerning public monies automatically deserves protection. The Supreme Court distinguishes between speech that "seek[s] to bring to light actual or potential wrongdoing or breach of public trust," thus warranting protection, and speech that merely reflects an employee's dissatisfaction with the employment situation. *Connick v. Myers,* 461 U.S. 138, 148 (1983). We must therefore examine the context of the speech, particularly the reason for the speech. Was the speech intended to bring wrongdoing to light, to raise issues of public concern because they are of public concern, or to further some purely private interest? *Roth v. Veteran's Admin.,* 856 F.2d 1401, 1405–06 (9th Cir. 1988). A public employee may not transform a personal grievance into a matter of public concern by invoking a supposed public interest in the way a governmental agency is run. *Ferrara v. Mills,* 781 F.2d 1508, 1515–16 (11th Cir. 1986).

The defendants argue that the plaintiff spoke in the context either of saving his job or of garnering extra-agency support for his proposed policy of fee disclosure. Viewing the speech in this context, they argue, demonstrates that it is not a matter of public concern.

To support their position that the plaintiff's speech was not a matter of public concern, the defendants assert that they could have reasonably relied on *Zaky v. U.S. Veterans Administration,* 793 F.2d 832 (7th Cir.), *cert. denied* 479 U.S. 987 (1986). In *Zaky* a Veterans' Administration doctor voiced his concerns about patient care to hospital personnel only after formal charges had been filed against him for abandoning a seriously ill patient. Subsequently, the doctor, who was in his probationary employment period, had a documented history of difficult personal relations with the staff. Additional charges were filed, there was dissatisfaction with his job performance, and his employment was finally terminated. These circumstances, very different from the circumstances in this case, warranted a conclusion that taken in context the doctor's speech was of private, not public concern.

The defendants also rely on *Hesse v. Board of Education,* 848 F.2d 748 (7th Cir. 1988), *cert. denied* 489 U.S. 1015 (1989), another case which is easily distinguished from the case at bar. In *Hesse,* over a five-year period a public school teacher sent a series of memoranda to the school administration defending his teaching methods. Included in the series was a memorandum criticizing the school system's grading policy. This memorandum arguably raised a matter of public concern. However, the *Hesse* case can be interpreted as holding that the point of this memorandum, when analyzed in the context of the teacher's long-standing personal dispute with the administration, did not rise to the level of public concern. *Hesse* at 848 F.2d at 752. Rather, the memorandum aired the teacher's personal grievances and challenged the administration's criticisms of his teaching methods.

341

While we agree with the defendants that the *Zaky* and *Hesse* cases allow a court to examine the motive underlying an employee's speech, we conclude that the facts of *Zaky* and *Hesse* are not analogous to those of the case at bar and that the defendants could not have reasonably relied on these cases.

Unlike in *Zaky,* the plaintiff in the case at bar voiced his concerns before he knew of any formal charges against him. Unlike in *Hesse,* the plaintiff in the case at bar had no personal interest in the finder's fees or their disclosure; his speech was not directed to matters of a personal interest related to his job.

Although the defendants assert that individual trustees had told the plaintiff of dissatisfaction with some aspects of his job performance, there is no evidence that the plaintiff was told or had reason to believe that he was in danger of discharge. There is nothing in the record to indicate that the trustees reprimanded or disciplined the plaintiff in any way. The defendants assert that evidence of the plaintiff's poor job performance was growing during the several days or weeks before he was discharged. Specifically, the defendants claim evidence that the plaintiff was mismanaging the agency, alienating key employees, interfering with and obstructing crucial decisions of the professional staff, and threatening the financial integrity of the loan to The Company Store by undermining the workout of the loan.

Although some of the trustees talked to the plaintiff about their concerns about some of these matters, much of the information that some trustees were gathering about the plaintiff was deliberately withheld from the plaintiff. In any event, it is undisputed that the trustees never officially or formally advised the plaintiff that his job was in jeopardy before he was

discharged. This factor distinguishes this case from other cases upon which the defendants rely.

Drawing inferences most favorable to the party opposing summary judgment (here the plaintiff), we must conclude that any knowledge the plaintiff may have had of criticisms of his job performance cannot be equated with a belief that his job was in imminent jeopardy. The undisputed evidence is that about eight months before the trustees discharged the plaintiff they favorably reviewed his job performance and gave him a substantial salary increase.

When the plaintiff met with the Attorney General and State Auditor, he brought the following notes: "I've come to you as our professional resource and apparently as protection. After 18 years in Washington, D.C. I know influence peddling, but this intimidation is direct. No job security." Again, from these undisputed facts we must draw those inferences most favorable to the party opposing summary judgment (here the plaintiff). Accordingly we infer that the plaintiff was concerned that his consulting with the Attorney General and State Auditor might put his job in jeopardy. We cannot draw the inference unfavorable to the plaintiff that his only or principal concern was that his job was in jeopardy for reasons relating to his mismanagement.

In any event, whether the plaintiff considered his job to be in jeopardy when he spoke with the trustees, the State Auditor or the Attorney General remains in dispute.

Furthermore, even if the plaintiff believed his job was at risk and his personal motivation was to protect his job, such a motivation does not necessarily negate or overcome the essentially public nature of the speech. Even if an employee is involved in an ongoing dispute

343

with an employer and has concerns about the job, a court may conclude that as a matter of law the employee's speech relates to a matter of public concern. *See, e.g., Connick v. Myers,* 461 U.S. 138, 149 (1983) (one part of employee's speech related to matter of public concern even though employee engaged in ongoing dispute with supervisor); *O'Brien v. Town of Caledonia,* 748 F.2d 403 (7th Cir. 1984) (police officer's concerns that criminal citations were not issued for political reasons were of great public interest despite the officer's co-existing private concern about job retention); *Rode v. Dellarciprete,* 845 F.2d 1195, 1201 (3d Cir. 1988) (employee's speech on matter of public concern protected by first amendment even though speech arose out of employee's personal employment problem; complete reliance on the employee's motivation for speaking is inappropriate).

We conclude that, viewed in light of the existing case law, the plaintiff's speech about possible influence peddling and the potential unwise use or misuse of hundreds of thousands of public dollars meets the public concern test with respect to context and falls well within a right supported by clearly established law, even if the plaintiff was concerned about job retention.

We now proceed to the final step in the *Connick* analysis and determine whether the form of the plaintiff's speech demonstrates that he spoke on a matter of public concern. In analyzing the form of the plaintiff's speech, we must consider the time, place and manner of the speech. *Connick v. Myers,* 461 U.S. 138, 152 (1983). While form and context may overlap, the case law suggests that "form" refers to the tone of the speech and the forum in which it is made, while "context"

refers to the circumstance in which the speech arises. *Wulf v. City of Wichita,* 883 F.2d 842, 860, n.26 (10th Cir. 1989).

There can be little doubt that the form of the plaintiff's speech satisfies the third prong of the *Connick* test and thus warrants protection. The United States Supreme Court has held that a public employee's concerns expressed privately to public officials warrant protection under the First Amendment. *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 415–416 (1979). Moreover, the Seventh, Second, and Sixth Circuits Courts of Appeal have held that when a public employee speaks to investigating authorities on subjects relating to their duties, the speech is protected. *O'Brien v. Town of New Caledonia,* 748 F.2d 403 (7th Cir. 1984) (police officer's speech to District Attorney, judge, and Federal Bureau of Investigation about possible misconduct by police chief protected); *Rookard v. Health and Hospitals Corporation,* 710 F.2d 41 (2d Cir. 1983) (nurse's speech to investigatory agency about wasteful practices and possible hospital mismanagement protected); *Marhonic v. Walker,* 800 F.2d 613 (6th Cir. 1986) (employee's speech to state Attorney General investigating unlawful medicaid billing practices protected).

After considering the totality of the circumstances and applying the teachings of *Connick v. Myers* and its progeny, we conclude that the information the plaintiff conveyed to the Auditor and the Attorney General was of public, not merely personal or private, concern. Furthermore, we conclude that at the time the defendants discharged the plaintiff the defendants knew or should have known, on the basis of clearly established law,

that the plaintiff's speech was about a matter of public concern.

## B.

A showing that the plaintiff's speech touches on a matter of public concern does not automatically merit constitutional protection; it does not, by itself, defeat the defense of qualified immunity. Rather, such speech is protected only if a court concludes as a matter of law that the employee's First Amendment right to comment on matters of public concern outweighs the governmental interest in the efficiency of the public services it performs through its employees. *Pickering v. Board of Education,* 391 U.S. 563, 568 (1968). "*Pickering* asks whether the state's allegedly retaliatory action is justified in light of the competing interests of the employee as a citizen and the state as employer." *Berg v. Hunter,* 854 F.2d 238, 243 (7th Cir. 1988).

In a summary judgment motion on qualified immunity, it is assumed that the public employer's retaliatory action was based on the employee's speech. *Rakovich v. Wade,* 850 F.2d 1180, 1210 (7th Cir. 1987) (en banc), *cert. denied,* 488 U.S. 968 (1988). Nevertheless, if a public employer's ability to perform and carry out its public function is sufficiently disrupted by the speech in question, the speech does not merit constitutional protection. Among the factors to weigh in the *Pickering* analysis are the manner, time, and place of the employee's expression, the context in which the dispute arose, *Rankin v. McPherson,* 483 U.S. 378, 388 (1987), and the state interest in the effective functioning of the public employer's enterprise. *Rankin v. McPherson,* 483 U.S. 378, 388 (1987). Considerations

relating to effective functioning include matters such as whether the employee's speech breached confidentiality, impeded the employee's ability to perform his or her responsibilities, impeded the employee's close and personal employment relationship with superiors and coworkers, interfered with discipline among co-workers, or otherwise interfered with the regular operations of the enterprise. *Rankin v. McPherson,* 483 U.S. 378, 388 (1987); *Barnhill v. Board of Regents* 166 Wis. 2d 395, 411, 479 N.W.2d 917 (1992); *Frazier v. King,* 873 F.2d 820, 825 (5th Cir.), *cert. denied, Davoli v. Frazier,* 493 U.S. 977 (1989); *Ohse v. Hughes,* 816 F.2d 1144, 1151 (7th Cir. 1987); *Rookard v. Health & Hospitals Corp.,* 710 F.2d 41, 46 (2d Cir. 1983).

Because a wide variety of fact situations may give rise to an employee's speech on matters of public concern, the United States Supreme Court has not set forth a rigid or general standard against which an employee's statements may be judged. *Pickering v. Board of Education,* 391 U.S. 563, 569 (1968). However, *Pickering* does require that to defeat the employee's speech interest, the statement must cause an actual and material disruption. *Pickering,* 391 U.S. at 572; *Rankin v. McPherson,* 483 U.S. 378, 388–389 (1987); *Barnhill v. Board of Regents,* 166 Wis. 2d 395, 420, 479 N.W.2d 917 (1992).

Additionally *Pickering* and its progeny make clear that only the disruptive effects of the speech in question can be considered in conducting the balancing test. In *Pickering* a public school teacher wrote a letter to the editor of a local paper criticizing the school board's management and expenditure of funds. The Court's analysis of the disruption caused by the teachers actions was limited to the disruptiveness of the letter itself. *Pickering,* 391 U.S. at 567–568. *See also Rankin*

347

*v. McPherson,* 483 U.S. 378, 388–89 (1987) (employee's speech not disruptive because "there [was] no evidence that it interfered with the efficient functioning of the office. . . . Nor was there any danger that McPherson had discredited the office by making her statement in public"); *Conner v. Reinhard,* 847 F.2d 384, 388 (7th Cir. 1988) (public official may retaliate against employee for speech only if statements "so disruptive that they substantially impeded the performance of her duties or interfered with the functioning of the office"); *Roth v. Veteran's Administration,* 856 F.2d 1401, 1407–08 (1988) ("whistleblowing" by its nature engenders some hostility; dispute about the extent of office disruption requires a trial). In *Barnhill v. Board of Regents,* 166 Wis. 2d 395, 420, 417, 479 N.W.2d 917 (1992), the court said that "the public employer must show actual, material and substantial harm to its operations *as a result of the employee's speech*" (emphasis added).

According to the defendants' brief, they reasonably believed that the plaintiff's speech would have a potentially disruptive effect on the Investment Board's operations. They further assert that by taking the fee disclosure issue outside the Investment Board the plaintiff would undermine the trustees' authority to make investment policy. However, the defendants have presented no evidence that the plaintiff's speech was actually and substantially harmful to the effective functioning of the Investment Board. Indeed the defendants deny they terminated the plaintiff's employment because of his speech.

Some cases appear to require evidence of disruption. *See, e.g., Conner v. Reinhard,* 847 F.2d 384, 392 (7th Cir. 1988). Other cases allow a court to look at the ordinary or foreseeable effect of the speech in contro-

versy and to determine whether it could be reasonably calculated to create division, to disrupt the office, to impair discipline, or destroy close working relationships. *See, e.g., Patkus v. Sangamon-Cass Consort.,* 769 F.2d 1251, 1258 (7th Cir. 1985); *Marquez v. Turnock* 967 F.2d 1175, 1179 (7th Cir. 1992).

The defendants' bald assertions of the disruptive effect of the plaintiff's speech do not satisfy either standard. The matters about which the plaintiff spoke were properly within the scope of his responsibility; it was his duty to see to it that public monies were not used improperly and that proper procedures were followed; the time, place and manner of his speech were appropriate; no confidential material was divulged. By first approaching the trustees with his concerns and then approaching the Attorney General and the State Auditor privately, the plaintiff attempted to minimize the disruption of working relations. Public confidence in the trustees' ability to perform their functions was thus not undermined by the plaintiff's disclosures. The parties dispute whether the speech arose in the context of the plaintiff's job security.

Citing *Rankin v. McPherson,* 483 U.S. 378, 390 (1987), the defendants argue that the plaintiff's high rank would lead to confusion about whether he raised concerns as an individual or on behalf of the trustees. Nothing in the record, however, would lead one to believe that the plaintiff was speaking for the trustees on the issue of finder's fees or undue influence.

We would expect that the plaintiff's speech would cause friction and hostility with some or even most of the trustees. It would be absurd, however, to hold that the First Amendment authorizes public officials who believe themselves charged with misfeasance to punish an employee who has brought forth a matter of public

concern because the speech caused friction between them and the employee and thus disrupted the office. *Czurlanis v. Albanese,* 721 F.2d 98, 107 (3d Cir. 1983) (quoting *Porter v. Califano,* 592 F.2d 770, 773–74 (5th Cir. 1979)). In this case, such friction or disruption must be weighed against the potential exposure of misuse of public monies and undue influence. The greater the public concern, the greater the disruption must be to give rise to qualified immunity. *Matherne v. Wilson,* 851 F.2d 752, 761, n.53 (5th Cir. 1988).

Under the circumstances of this case, the *Pickering* scales weigh in favor of the plaintiff. The plaintiff's First Amendment interests in his speech predominate over the defendants' assertions of disruption.

## C.

The defendants do not rest, however, on the argument that the plaintiff's speech was disruptive. Rather, their primary argument is that his poor job performance justified his discharge. The defendants assert that in June 1989 they knew of the plaintiff's mismanagement, the staff's dissatisfaction with the plaintiff, and the "disruptiveness" of the plaintiff's presence as executive director. Thus, according to the defendants, the court must consider in the *Pickering* balance the defendants' assessment of the plaintiff's job performance aside from his speech.

The defendants rely on *Elliott v. Thomas,* 937 F.2d 338 (7th Cir. 1991), *cert. denied,* — U.S. —, 112 S.Ct. 1242 (1992) and *Marquez v. Turnock,* 967 F.2d 1175 (7th Cir. 1992), to support their contention that job performance and factors other than the speech in question are relevant to the *Pickering* balancing. Their reliance on these cases is misplaced. First, since the cases were decided after June 1989, they are not rele-

vant authority for determining what the defendants reasonably should have known at the time they discharged the plaintiff. More importantly, the cases do not support the defendants' position.

*Elliott v. Thomas* does not support the defendants' position that a public official's defense of acting properly goes to the issues to be decided at this summary judgment-qualified immunity stage. *Elliott,* 937 F.2d at 343.

In *Marquez* the court did not consider the employee's job performance apart from his speech. The court probed the *Pickering* balance and concluded on the basis of the employee's own evidence that his speech had disrupted the efficiency of the office and created "an intolerable situation." *Marquez,* 967 F.2d at 1179. Thus the issue was the disruptiveness of the speech in question, not the employee's general job performance.

We agree with the plaintiff that under the clearly established law in June 1989, job performance issues unrelated to the speech were not part of the *Pickering* balance. The defendants will have the opportunity at trial to show that the plaintiff would have been discharged even in the absence of the protected speech. *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 287 (1977).

■

After considering the totality of the circumstances and applying the teachings of *Pickering* and its progeny, we conclude that the plaintiff's First Amendment rights outweigh the Investment Board's interest in prohibiting the speech or its right to discharge him for exercising the right to speak. *Conner v. Reinhard,* 847 F.2d 384, 388 (7th Cir. 1988). We further conclude that when the defendants discharged the plaintiff the

defendants knew or should have known, on the basis of clearly established law, that the Investment Board's interests would not survive a balancing inquiry.

For the reasons set forth, we conclude that no further factfinding is required to decide the issue of qualified immunity and that the defense of qualified immunity does not shield the defendants from this suit.

## IV.

We now turn to the motion to dismiss the plaintiff's claims for damages and equitable relief against the defendants in their official capacities.

We conclude that the plaintiff's suit for damages fails. The United States Supreme Court has held that the threshold inquiry for sec. 1983 actions for damages against public officials in their official capacities is whether the official is a person within the meaning of sec. 1983. *Will v. Michigan Department of State Police,* 491 U.S. 58 (1989). Although it may seem obvious that state officials are persons, the Court has held that a suit for damages against a state official in his or her official capacity is a suit not against the official but against the official's office. As such it is no different from a suit for damages against the state. Accordingly, the Court has held that neither states nor their officials acting in their official capacities are persons under sec. 1983. We therefore dismiss the plaintiff's claim for damages against the defendants in their official capacities.

The plaintiff can, however, secure prospective, equitable relief from state officials in their official capacities. A state official sued for injunctive relief in his or her official capacity is a person under sec. 1983 and thus subject to suit, because " 'official-capacity actions for prospective relief are not treated as actions

against the State.' " *Will v. Michigan Department of State Police,* 491 U.S. 58, 71, n.10 (1989) (citing *Kentucky v. Graham,* 473 U.S. 159, 167 (1985)). *See also Hafer v. Melo,* — U.S. —, —, 112 S. Ct. 358, 361–62 (1991).

■

The parties agree that to obtain injunctive relief the plaintiff must establish that the state officials who violated his rights were acting pursuant to state policy or custom. *Hafer v. Melo,* — U.S. —, —, 112 S. Ct. 358, 362 (1991). An official acts pursuant to state policy or custom under one of two circumstances. The act must be either pursuant to "a policy statement, ordinance, regulation, or decision adopted and promulgated by that body's officers"[14] or must be performed by an official who has "final policymaking authority."[15] Because the plaintiff cites no policy statement or decision promulgated by the trustees as applicable to this case, the question then is whether the defendants are final policymakers, in which case their acts could form the basis of official capacity liability.

■

Whether a person is a final policymaker is a question of state law. *City of St. Louis v. Praprotnik,* 485 U.S. 112, 124 (1988) (plurality opinion); *Pembaur v. Cincinnati,* 475 U.S. 469, 483 (1986) (plurality opinion). The federal cases have taken several approaches to this issue. Some cases equate policymaking with legislative power, others with executive power. *Auriemma v. Rice,* 957 F.2d 397, 399 (7th Cir. 1992).

---

[14] *City of St. Louis v. Praprotnik,* 485 U.S. 112, 121 (1988) (quoting *Monell v. Department of Social Services,* 436 U.S. 658, 690 (1978) (plurality opinion).

[15] *City of St. Louis v. Praprotnik,* 485 U.S. 112, 123 (1988) (plurality opinion).

When an official's discretionary decisions are constrained by policies set forth by another, that official is not a final policymaker as to those policies. Public officials are not final policymakers if, under state law, their decisions are subject to *de novo* review. *City of St. Louis v. Praprotnik,* 485 U.S. 112, 127 (1988) (plurality opinion).

In deciding whether the defendants are final policymakers for purposes of this suit, the parties appear to agree that the Investment Board has the statutory power to appoint an executive director and retains and exercises decisionmaking authority with respect to the plaintiff's employment.

The defendants assert, however, citing sec. 230.03(9), (11), 230.04, Stats. 1991–92, that the Department of Employment Relations has the "legislative" authority to make personnel policy for both the classified and unclassified divisions of the civil service. The defendants also contend that the legislature has retained policymaking authority with respect to retaliatory discharges. They base this argument on three statutes proscribing retaliatory discharges, secs. 230.83,[16] 230.85[17] and 895.65,[18] Stats. 1991–92. Sec-

[16] Section 230.83(1) provides:

"No appointing authority, agent of an appointing authority or supervisor may initiate or administer, or threaten to initiate or administer, any retaliatory action against an employe."

[17] Section 230.85(1) provides:

"An employee who believes that a supervisor or appointing authority has initiated or administered or threatened to initiate or administer, a retaliatory action against that employe in violation of s. 230.83 may file a written complaint with the [personnel] commission. . . ."

[18] Section 895.65(2) provides:

tion 230.83, Stats. 1991–92, for example, prohibits an appointing authority from administering any retaliatory action against an employee. Furthermore, argue the defendants, sec. 230.85 provides for *de novo* review by the personnel commission of an employee's complaint that an appointing authority has administered retaliatory action.

The defendants contend that the state's policy proscribing retaliatory discharges is manifest in these statutes. Thus, the defendants argue, if they had discharged the plaintiff in retaliation for speaking on a matter of public concern and if his interests outweighed those of the board, then the defendants violated rather than implemented state policy and could be sued in this action only in an individual capacity.

Sections 230.83, 230.85 and 895.65, Stats. 1991–92 do not apply to employees whose positions are assigned to an executive salary group.[19] The parties dispute whether these sections apply to the plaintiff and whether the plaintiff's position is within an executive salary group. While the executive director's position had at one time been within an executive salary group, it was later removed from that status. 1987 Wis. Act 399, secs. 91, 92, effective May 17, 1988.

"An employe may bring an action in circuit court against his or her employer or employer's agent, including this state, if the employer or employer's agent retaliates, by engaging in a disciplinary action, against the employe because the employe exercised his or her rights under the first amendment to the U.S. constitution by lawfully disclosing information or because the employer or employer's agent believes the employe so exercised his or her rights. . . ."

[19] The definition of employe under these statutes is "any person employed by any governmental unit except: . . . A person who is . . . assigned to an executive salary group under s. 20.923." Sections 230.80(3)(b), 895.65(1)(b)2., Stats. 1991–92.

Therefore, as of June 1989, the position of executive director was not within an executive salary group and was thus governed by these statutes protecting employes from retaliatory actions.

We therefore conclude that, for purposes of the issue presented in this case, the defendants are not final policymakers under Wisconsin law, and that the plaintiff cannot maintain this action against them in their official capacities.

Accordingly, we reverse that part of the decision of the court of appeals refusing to dismiss the plaintiff's claim against the defendants in their official capacities.

*By the Court.*—The decision of the court of appeals is modified in part and as modified affirmed; reversed in part; and remanded.

Justices ROLAND B. DAY and JANINE P. GESKE took no part.

WILLIAM A. BABLITCH, J. *(concurring)*. I join both the reasoning and the result of the majority opinion. I also join the concurring opinion authored by Justice Wilcox. I write only to express a concern regarding one of the named defendants.

At oral argument, Mr. Burkes' attorney was asked the reason why Nicholas Hurtgen was named as a defendant in this matter. Although Hurtgen sometimes sits as trustee as the secretary's designee, Hurtgen did not sit as trustee in this particular matter, nor did he cast a vote. From the record before us, I can discern, at best, only peripheral involvement by Mr. Hurtgen. The answer given at oral argument was unsatisfactory.

JON P. WILCOX, J. *(concurring)*. The majority correctly concludes that under the law as it exists today, these defendants are not entitled to the defense of qualified immunity. Because I am bound by that law, I concur with the majority's holding. I write separately, though, to express my dissatisfaction with what I perceive to be significant flaws in qualified immunity jurisprudence.

In a democratic society, the operation of government relies upon the participation of average citizens. Generally speaking, these individuals are not legal experts. Nonetheless, the positions they occupy, often at great personal sacrifice and without compensation, require them to make controversial decisions on matters of public importance without the luxury of time or complete knowledge. The doctrine of qualified immunity enables officials to carry out their vital public duties in a vigorous, principled manner. It is not in society's best interest to have these individuals subjected to personal liability whenever their conduct falls short of some legal ideal. In the end, qualified immunity acts to "protect the public at large, not to benefit its agents." *Wyatt v. Cole*, — U.S. —, 112 S. Ct. 1827, 1833 (1992).

Society, of course, also benefits from the informed opinions of public employees. After all, these employees are often in the best position to know what problems may exist within an agency. No reasonable person can suggest that civic-minded, responsible individuals should be punished for voicing their opinion on matters of public concern.

The difficulty lies in trying to strike a balance between the employee's interest in expressing his or her views and the employer's interest in ensuring the effective and efficient fulfillment of its responsibilities

357

to the public. *Pickering v. Board of Education,* 461 U.S. 563 (1968). In my view, the law unrealistically skews this balance, leaving courts to express fine-sounding platitudes about the need for qualified immunity, but effectively limiting their ability to implement the doctrine.

The reason why is quite simple. Qualified immunity is an affirmative defense pleaded in a motion for summary judgment. At that stage, courts are bound to review the pleadings in the light most favorable to the party opposing the motion for summary judgment. *Green Spring Farms v. Kersten,* 136 Wis. 2d 304, 317, 401 N.W.2d 816 (1987). In qualified immunity cases, that party will be the employee. Summary judgment can only be granted if, after giving every reasonable inference to the employee, the *undisputed* facts indicate that under no circumstances can the employee recover. *Id.*

This is proper. Matters that are in dispute, especially those which implicate a person's right to free speech, should not be disposed of at summary judgment. The problem with qualified immunity analysis is that it prevents courts from truly considering all the undisputed facts of a case. As a result, public officials are subjected to litigation and liability in cases where a more encompassing inquiry at the summary judgment stage would have recognized their right to qualified immunity.

As the majority explains, there are only two inquiries to be addressed at this stage:

> 1) whether Burkes' statements to the State Auditor and the Attorney General touched upon matters of public concern, *Connick v. Myers,* 461 U.S. 138, 147–48 (1983), and if so,

358

2) whether Burkes' interest in making the statements exceeded the trustees' interest in ensuring the effective and efficient fulfillment of their responsibilities to the public. *Pickering v. Board of Education,* 461 U.S. 563 (1968).

These tests limit courts to considering solely the employee's speech and the disruptive aspects of that speech. *Rankin v. McPherson,* 483 U.S. 378 (1987); *Barnhill v. Board of Regents,* 166 Wis. 2d 395 (1992).[1] Thus, at the summary judgment stage on the issue of qualified immunity, courts cannot consider undisputed facts indicating that the employee's performance had been so poor that he or she was about to be fired anyway. Nor can courts adequately look at undisputed evidence that the employee's relationship with the employer was deteriorating, or that the employer has completely lost confidence in the employee's ability to perform his or her responsibilities for reasons unrelated to the speech.

In my opinion, *Connick, Pickering* and their progeny unduly limit a court's ability to review *all* undisputed facts when determining whether or not to recognize the defense of qualified immunity. The result is to place employers in a very difficult position. Suppose, for instance, the public employer has an employee who occupies an important, even vital government post. Suppose further that this employee's performance

---

[1] The idea that employers must demonstrate *actual* disruption, however, was rejected recently in *Waters v. Churchill,* — U.S. —, 1994 WL 223511 (U.S.) (1994), where the Supreme Court noted that its prior cases had "consistently given greater deference to government predictions of harm used to justify restriction of employee speech that to predictions of harm used to justify restrictions on the speech of the public at large." *Id.* at —.

has been so poor, and his behavior so erratic, that the employer is legitimately concerned that its operations are threatened. In fact, it is so concerned that it is on the verge of discharging the employee. Getting wind of this, the employee rushes to the press or to law enforcement officials or even to the employer itself and makes accusations of corruption which may or may not be accurate. I believe that an employer in that situation should not be so intimidated by the fear of litigation that it fails to do what it reasonably believes is in the public interest. I would allow courts to consider these *undisputed* facts in the qualified immunity analysis.

The scenario described above is not so different, in my view, from what happened in this case. I believe the pleadings in this case, even when read in a light most favorable to Burkes, amply establish that his relationship with the trustees was deteriorating long before he raised his vague allegations of "influence peddling" and "employee intimidation" to the attorney general.[2] Ideally, all of the undisputed facts pertaining to Burkes' relationship with the trustees, even though unrelated to Burkes' actual speech, could be considered in a court's analysis of whether the trustees' decision to discharge Burkes was reasonable given the entire context of the relationship.

The approach I recommend is consistent with the sentiments, if not the analysis, expressed in many Supreme Court decisions. For instance, in *Waters v. Churchill,* — U.S. —, 1994 WL 223511 (U.S.) (1994), the Court observed that:

---

[2] It is undisputed that at the June board meeting, and again at the June 23 meeting at which he was discharged, Burkes told the trustees that he was not aware that anyone associated with SWIB had done anything illegal or even improper with respect to finders fees in the real estate division.

360

> The key to First Amendment analysis of government employment decisions, then, is this: The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer. The government cannot restrict the speech of the public at large just in the name of efficiency. But where the government is employing someone for the very purpose of effectively achieving its goals, such restrictions may well be appropriate.

*Id.* at —.

On other occasions, the Court has declared that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant,* — U.S. —, 112 S. Ct. 534, 537 (1991); *Anderson v. Creighton,* 483 U.S. 635, 638 (1987). The Court has also instructed that "[i]n performing the *[Pickering]* balancing, the [employee's] statement will not be considered in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." *Rankin,* 483 U.S. at 388. Unfortunately, in my opinion, the Court then compromises these common sense sentiments by preventing courts from truly engaging in a comprehensive consideration of all undisputed facts.

I would favor lending substance to these sentiments by allowing courts in cases such as this to consider the entire context of the employment relationship. If, in light of all the undisputed facts, including those which preceded the employee's speech, it appears the employer reasonably believed its discharge of the employee was necessary to ensure efficient operations, I would grant qualified immunity. As the law stands today, nothing prevents a public employee whose job is

threatened from making vague allegations of corruption in order to acquire an immunity of their own, an immunity from the government's rightful exercise of its duty to ensure effective operations. Such a result is inconsistent with the goals qualified immunity is designed to further. ("[P]ermitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Anderson,* 483 U.S. at 638.) I believe qualified immunity requires us to engage in a more searching inquiry.

I am authorized to state that Justice DONALD W. STEINMETZ and Justice WILLIAM A. BABLITCH join in this concurring opinion.