**Anthony MARQUEZ, Plaintiff–Appellant,**

v.

**Bernard TURNOCK, Director of the Illinois Department of Public Health, Shirley Randolph, Associate Director of the Illinois Department of Public Health, and Leslie Stein–Spencer, Division Chief in the Illinois Department of Public Health, all individually and in their official capacities, Defendants–Appellees.**

**No. 91–2635.**

United States Court of Appeals, Seventh Circuit.

Argued May 29, 1992.

Decided July 16, 1992.

Mary L. Leahy (argued), Cheryl R. Jansen, Kathryn Eisenhart, Springfield, Ill., for plaintiff-appellant.

Chip Schmadeke, Office of the Atty. Gen., Springfield, Ill., Lance T. Jones (argued), Gordon & Glickson, Chicago, Ill., for defendants-appellees.

Before CUDAHY, EASTERBROOK and RIPPLE, Circuit Judges.

CUDAHY, Circuit Judge.

Anthony Marquez, formerly the Chief of Program Operations of the Illinois Department of Public Health's (the Department) Emergency Medical Services (EMS) Division, brought this suit against various Department officials. Marquez alleged that the defendants had violated his first

amendment rights by eliminating the Chief of Program Operations position in retaliation for statements he made criticizing his supervisor's running of the EMS Division. Following the presentation of Marquez's evidence, the district court granted the defendants' motion for a directed verdict. 765 F.Supp. 1376 (C.D.Ill.1991). Marquez appeals and we affirm.

## I.

In reviewing a district court's grant of a motion for a directed verdict, we apply the same standard as the district court. *North v. Madison Area Ass'n for Retarded Citizens–Developmental Corp.*, 844 F.2d 401, 403 (7th Cir.1988). "A directed verdict is appropriate only if the evidence, viewed in the light most favorable to the nonmovant, fails to provide a basis on which a jury could reasonably hold for the nonmovant." *Birdsell v. Board of Fire & Police Comm'rs*, 854 F.2d 204, 206 (7th Cir.1988). Thus, in summarizing the facts we draw all reasonable inferences in favor of Marquez.

The Emergency Medical Services Act, Ill. Rev.Stat. ch. 111½, §§ 5501 *et seq.* (1990) (the EMS Act), gives the Illinois Department of Health statewide authority over the planning, evaluation and regulation of pre-hospital emergency medical services systems. The EMS Division carries out those functions on behalf of the Department. From June of 1975 until August of 1988, plaintiff Marquez was the Chief of Program Operations of the EMS Division. In that capacity, he was primarily responsible for licensing ambulance services and ensuring EMS system compliance with the requirements of the EMS Act. Marquez began the state's paramedic program and eventually was given responsibility for all aspects of the program except training. He wrote the vast majority of the rules and regulations of the Department with respect to ambulance licensure, radio communication and the EMS and paramedic programs.

Since 1978 the Chief of Program Operations has reported to the EMS Division Chief. Marquez applied for the position of Division Chief three times during his tenure as Chief of Program Operations. All three times the job went to someone else. In 1986, the third time Marquez applied, the position went to Leslie Stein–Spencer, a registered nurse with a master's degree in hospital administration. Marquez was disappointed that he had not been given the job, and he complained to others that Stein–Spencer was "not qualified" for the position.

Over the course of the next two years, Marquez continually clashed with Stein–Spencer over Stein–Spencer's responses to violations of EMS regulations by various ambulance services. As part of his job duties, Marquez was responsible for investigating complaints about ambulance services and allegations of noncompliance with the EMS regulations. In several cases, Marquez recommended suspension either of an ambulance service or of one of its employees, but Stein–Spencer chose instead to impose probation in connection with a plan for correcting the violations. When Marquez voiced his disagreement with these decisions to Stein–Spencer, she generally responded that it was "her decision."

These disagreements culminated in a May 25, 1988 memorandum that Marquez wrote to Stein–Spencer in which he questioned her decision to assign the investigation of Arrow Ambulance Services (Arrow) to the Regional EMS Coordinator rather than to him and criticized her handling of two previous investigations of Arrow. Marquez wrote that if Arrow had been suspended after the second investigation, as he had recommended, "quality emergency prehospital care could now be a reality in the Champaign–Urbana community." This last part of the memo was quoted in a July 27, 1988, Champaign *News Gazette* article regarding the efforts of the owner of Arrow, Carle Hospital, to be designated a Level I Trauma Center under the EMS Act. The memo was also referenced in a similar article that appeared in August of that year. Also in August, a newspaper article that appeared in the Belleville *News–Democrat* cited Marquez as the source of information regarding an investigation into another ambulance service.

That article prompted a memorandum from Stein–Spencer to Marquez stating that Marquez's statements violated a Department directive allowing only certain designated individuals to speak for the Department and instructing him to "refrain from speaking to any news people on any EMS issue."

Marquez also voiced his complaints about Stein–Spencer to Timothy O'Brien, Chief Counsel of the Department. In June of 1988, Marquez met with O'Brien and gave him copies of the documentation of the investigations he had performed during Stein–Spencer's tenure. Marquez asked O'Brien to review the documents, show them to Bernard Turnock, the Director of the Department, and to arrange a meeting with Turnock. Although the meeting never occurred, Turnock did review the documents and found no basis for Marquez's concerns. He did, however, expand an already scheduled audit of the Ambulance Licensing Program to include the entire EMS Division. Marquez met with the auditors and provided them with the same package of information he had given to O'Brien.

In August of 1988, Turnock approved the transfer of Marquez out of the EMS Division for a six month "special assignment." When Marquez called Turnock to inquire about the reassignment, Turnock told him that the Department wanted Stein–Spencer to be able to do her job. The next month, the position of Chief of Program Operations was eliminated. In January of 1989, Marquez was given the choice of accepting a lateral transfer to a research position in injury control or being laid off as of February 15. Marquez chose the transfer, and then filed this suit. Marquez alleges that he was transferred and his position eliminated in retaliation for his criticisms of Stein–Spencer. He contends that those statements constituted speech on a matter of public concern which is protected under the rule of *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). For purposes of this analysis we will assume (and the proposition is not contested) that Marquez's lateral transfer was a burden sufficient to trigger the question of a constitutional violation.

See, e.g., *Greenberg v. Kmetko*, 840 F.2d 467 (7th Cir.1988) (en banc); *Egger v. Phillips*, 710 F.2d 292 (7th Cir.1983) (en banc).

## II.

In *Pickering*, the Supreme Court held that a public employee does not give up his First Amendment rights to speak on matters of public importance by virtue of his government employment. 391 U.S. at 568, 88 S.Ct. at 1734. In determining whether an adverse employment decision by the state violates those rights, the court must "arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* Here, the district court directed a verdict for the defendants based on its conclusion that Marquez's statements did not implicate his First Amendment rights because Marquez was not speaking "as a citizen" and his statements did not involve a "matter of public concern." In addition, the court found that even if Marquez did have some "limited First Amendment interest" in making the statements that interest was outweighed by the effects of those statements on the efficient functioning of the EMS Division.

### A. *Marquez's First Amendment Interest*

In concluding that Marquez's criticisms of Stein–Spencer did not constitute speech on a matter of public concern, the district court relied primarily on the Supreme Court's decision in *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). In *Connick*, an assistant district attorney was fired after she distributed a questionnaire "soliciting the views of her fellow staff members concerning office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressured to work in political campaigns." *Id.* at 141, 103 S.Ct. at 1687. The Court held that

> when an employee speaks not as a citizen upon matters of public concern, but in-

stead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior....

Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement.

*Id.* at 147–48, 103 S.Ct. at 1690. The Court concluded that only one of the questions in the survey could be considered to touch on a matter of public concern; the others simply "reflect one employee's dissatisfaction with a transfer and an attempt to turn that displeasure into a cause célèbre." *Id.* at 148, 103 S.Ct. at 1691. Similarly here, the court found that "the content of most of [Marquez's] speech involved internal office decisions" rather than matters of public concern and that the statements were "motivated by personal dissatisfaction and his desire to turn his dissatisfaction into a cause célèbre."

We are much less certain than the district court that Marquez was not speaking on a matter of public concern. As the court itself noted, many of Marquez's statements stemmed from his disagreement with Stein–Spencer over "whether noncompliance [by ambulance services] with regulations should result in a summary suspension or in probation combined with a plan for corrective actions." It is clear from Marquez's May 25 memorandum to Stein–Spencer that one reason he argued for suspensions rather than probation was that he thought suspensions would lead to better compliance with the regulations. For example, Marquez wrote: "The Department's failure to exercise its legislatively mandated enforcement authority is largely responsible for the mockery that has been made of our EMS standards and rules." The way in which the Department of Public Health enforces its regulations with respect to ambulance services may well have an impact on the extent of compliance with those regulations, and therefore on the quality of ambulance services available to the public. A convincing argument can be made that the alleged failure of the Department adequately to enforce the state's EMS regulations is a "matter of public concern." *Cf. Knapp v. Whitaker,* 757 F.2d 827, 841 (7th Cir.1985) (public high school teacher's speech regarding mileage allowance for sports-related travel by high school coaches "was an attempt to inform the public and the educational policymakers of Peoria that officials in District 150 were failing in their duty to properly administer the allocation of public funds," and was therefore a matter of public concern).

Nor should it make any difference that most of Marquez's statements were made to other persons within the Department, rather than to the general public. The Supreme Court has held that "First Amendment protection applies when a public employee arranges to communicate privately with his employer rather than to express his views publicly." *Connick,* 461 U.S. at 146, 103 S.Ct. at 1689. In addition, some of Marquez's communication was directed to individuals with significant influence in the Department—in particular, O'Brien and Turnock. This fact suggests that Marquez, much more than the plaintiff in *Connick,* did "seek to bring to light actual or potential wrongdoings or breach of public trust." *Cf. Ohse v. Hughes,* 816 F.2d 1144, 1152 (7th Cir.1987), vacated and remanded, 485 U.S. 902, 108 S.Ct. 1070, 99 L.Ed.2d 230 (1988), opinion reinstated in part, 863 F.2d 22 (7th Cir.1988) (noting that plaintiff's "To Whom it May Concern" letter was "distributed to various figures in positions of public trust").

On the other hand, the district court's conclusion that Marquez's statements were not made "as a citizen" seems well-taken. As noted, virtually all of Marquez's criticisms of Stein–Spencer, including his communications to Turnock and the media, stemmed from their disagreement about how violations of the EMS regulations should be handled. In speaking on this issue, Marquez did not act simply as a member of the general public; it was his *job* to investigate such violations and make recommendations as to the appropriate response. *Cf. Egger,* 710 F.2d at 316–18 (in assessing the way in which plaintiff's speech touched upon matters of public con-

cern as opposed to "internal matters within the workplace of a more personal and parochial concern," the court found it "significant" that the subject matter of plaintiff's statements was within the scope of his job responsibilities). However, we need not resolve the question of public concern under *Connick* because we agree with the district court that, to the extent Marquez had a protected interest in making his statements, that interest was outweighed by the state's interest in the efficient functioning of the EMS Division.

## B. Pickering *Balance*

■ Once the court has determined that the speech at issue is a matter of public concern, "the court must then engage in the *Pickering* balancing test, weighing the interest of the public employee, as a citizen, in commenting upon matters of public concern with the interest of the State, as an employer, in promoting effective and efficient public service." *Knapp*, 757 F.2d at 839. There is some question whether an employer must show actual interference with the operation of the workplace in order to sustain its burden under *Pickering*. For example, in *Conner v. Reinhard*, 847 F.2d 384 (7th Cir.1988), we noted that this court "has suggested that evidence of the actual effects at issue is necessary before a court can find that an employer's functions have been substantially impeded by the employee's speech." *Id.* at 392. By contrast, in *Patkus v. Sangamon–Cass Consort.*, 769 F.2d 1251 (7th Cir.1985), we stated that, in striking the *Pickering* balance, "[t]he reviewing court is to look at the ordinary or foreseeable effect of the conduct in controversy and to determine whether it would be 'reasonably calculated to create division or to have impaired discipline.'" *Id.* at 1258 (quoting *Yoggerst v. Stewart*, 623 F.2d 35, 40 (7th Cir.1980)). The Supreme Court has stated in dicta that a public employer need not "tolerate action which he *reasonably believe[s]* would disrupt the office, undermine his authority, and destroy close working relationships." *Connick*, 461 U.S. at 154, 103 S.Ct. at 1694 (emphasis added). This language suggests that evidence of actual disruption is unnecessary.

Whichever approach is correct, in this case the *Pickering* balance must be struck in favor of the employer. Marquez's First Amendment interests in his speech, however they are weighed, do not predominate over Marquez's own evidence showing that his actions disrupted the efficiency of the office. The Department Director stated that one reason for Marquez's transfer was to allow Stein–Spencer to "do her job." Marquez himself stated that his poor relationship with Stein–Spencer created an "intolerable situation." The district court did not err in directing a verdict for the defendants.

## III.

For the foregoing reasons, the judgment of the district court is AFFIRMED.