Douglass H. BARTLEY, Plaintiff-Appellant,†

v.

Tommy G. THOMPSON, Defendant-Respondent.

Court of Appeals

*No. 94–3123. Submitted on briefs June 13, 1995.—Decided November 30, 1995.*

(Also reported in 542 N.W.2d 227.)

†Petition to review denied.

For the plaintiff-appellant the cause was submitted on the briefs of *Gaar W. Steiner* and *Heidi J. Zeeb* of *Steiner & Schoenfeld* of Milwaukee.

For the defendant-respondent the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Bruce A. Olsen*, assistant attorney general, of Madison.

Before Eich, C.J., Sundby and Vergeront, JJ.

EICH, C.J.   Douglass Bartley, a former member of the Wisconsin Tax Appeals Commission, sued Tommy G. Thompson, Governor of Wisconsin, when Thompson failed to nominate him to another term on the commission. He claimed that he had a "binding contract" for renomination, that the failure to renominate him violated his right to free speech, and that Thompson conspired with others to "obstruct"

Bartley in the performance of his duties by threatening to deny him renomination after Bartley voted to allow a large income-tax refund claim brought by several thousand federal pensioners to proceed before the commission. We affirm the trial court's dismissal of his action.

Bartley's complaint alleges the following facts.[1] He was appointed to one of two part-time positions on the tax appeals commission in 1987. At that time, the commission was comprised of five members, three of whom served full-time and two part-time. As a part-time commissioner, Bartley was permitted to maintain a private law practice, which he did.

In 1991, the two part-time commissioner positions were eliminated by the legislature and one of the full-time commissioners resigned. Bartley applied for appointment to fill out the remaining year of the former commissioner's term. He met with the governor's then chief of staff, Edward Marion, informing Marion that he would give up his law practice and take the full-time position on the "promise" that he would be renominated for a full six-year term the following year. Several days later, Marion telephoned Bartley and told him that his condition was acceptable and that the governor "did not want him for just one year." According to Bartley, Marion told him his renomination was secure "as long as [he] didn't do anything unnatural with sheep." He alleges he relied on Marion's statement as a representation that his renomination was "secure."

---

[1] For the purposes of a motion to dismiss, the well-pleaded facts are assumed to be true. *Evans v. Cameron*, 121 Wis. 2d 421, 426, 360 N.W.2d 25, 28 (1985). We thus take the facts pled as admitted for the purpose of this appeal.

A few days later, Bartley received a call from Thompson informing him that he was to be nominated to serve the one year remaining on the term of the former commissioner. According to Bartley, the governor asked him whether he was "happy" with that appointment,[2] and he responded in the affirmative.

Pending before the commission at the time was a case filed by several thousand retired federal employees living in Wisconsin who claimed the state had illegally assessed income taxes on their federal pensions over a period of several years. The case represented a potential liability for the state approaching $100 million, and Bartley authored the opinions announcing the commission's decisions that it had jurisdiction to hear the retirees' claim and that the retirees could proceed as a class.

After the decisions were announced, Marion telephoned Bartley indicating that the Wisconsin Department of Revenue was "very upset" with the results. Several weeks later, in November 1992, Bartley and another commissioner, representing a majority of the three-member agency, issued further

---

[2] While Bartley, in his complaint and at several points in his briefs to this court, refers to the governor's alleged promise to "reappoint" him to the commission, in fact the governor's power is one of *nomination*, not appointment. Section 15.06(1)(a), STATS., states that "members of commissions shall be *nominated by the governor*, and with the advice and consent of the senate *appointed* for . . . 6-year terms . . . ." (Emphasis added.) The governor thus nominates persons for membership on the commission and the "appointment" comes only upon favorable action by the state senate. To the extent the terms "appointment" *or* "reappointment" *may appear in this opinion, they should be considered synonymous with "nomination" and "renomination."

rulings in the case adverse to the state and the department. Bartley alleges that he then received a call from the commission chair, Mark Musolf (who had recused himself from the case due to his prior involvement in the dispute as secretary of the Revenue Department), during which Musolf remarked: "How can you do this when your appointment is up?" and "You're making a laughingstock of the Commission."

Bartley's initial term as a full-time commissioner was due to expire on March 1, 1993. On February 23, he faxed a letter to the governor's "personnel director," Pat Reuter, inquiring about his salary for the full six-year term. On March 2, Reuter informed Bartley that the governor was "not amused" by his letter and that his renomination was "not secure." When Bartley told Reuter that he had been "promised" renomination, Reuter said she would contact the governor and get back to him.

Bartley then telephoned Marion, who had since resigned his position in the governor's office and was in private law practice. Unable to reach Marion, Bartley left a message that he wanted to "confirm . . . the prior agreement." Marion returned the call a few days later stating that he would "remind" the governor of Bartley's concerns.

A few weeks later, on March 24, Reuter called to request that Bartley attend an "interview" on Monday, March 29, concerning his reappointment. Reuter stated that the governor's legal counsel, his appointments director, the state director of employment relations and the state treasurer were scheduled to be present at the meeting and that the purpose of the meeting was to discuss Bartley's "goals and objectives" as a member of the commission.

After initially agreeing to attend the meeting, Bartley changed his mind. He alleges he did so because he believed Reuter and the others wanted to talk to him about the pending pension case, and he felt the interview was just a ruse to justify a decision already made not to renominate him because of his rulings in the case. He faxed a letter to Reuter on the Friday before the scheduled Monday meeting stating:

> [W]hen I was appointed to the interim one-year term . . . I was promised an additional six-year term beginning this last March 1. Because I was given a seven-year contract, the matter of my reappointment is settled, and I see no good that can come from the Monday meeting, the subject of which is evaluating whether I should be given a job that has already been promised and filled.

Bartley asked Reuter to provide him with a written "confirmation of [his] reappointment," and said that once the confirmation was received, "I would then be very pleased to meet . . . with you or anyone else on the nature of our work at the commission or any other appropriate matters."

The governor's new chief of staff, William McCoshen, responded to Bartley's fax with a letter confirming the Monday interview "for consideration of a six year appointment to the Tax Appeals Commission." The letter concluded by stating: "Should you choose not to follow the formal interview process we will assume you are not interested in being considered for the appointment and we will proceed accordingly."[3]

---

[3] Bartley alleges that about this time he also received a telephone call from Musolf encouraging him to attend the meeting and noting that he (Musolf) was aware that Mark Bugher,

Bartley did not attend the meeting and a few days later was advised by McCoshen that another applicant for the position, Joseph Mettner, was being nominated to the commission.

Finally, the complaint refers to newspaper articles quoting Marion as stating that while Bartley had "pressured very hard" for the appointment, he "was never promised anything." The articles also indicated that Thompson's reason for failing to renominate Bartley to the commission was his "refus[al] to go through the [appointment] process . . . ."

Bartley seeks compensatory damages for the governor's breach of his "contract" to renominate Bartley to the commission "in the amount equivalent to six years' lost wages and fringe benefits . . . plus reasonable additions . . . and interest . . . as well as litigation costs." He seeks damages in the same sum for the governor's alleged violation of his civil and constitutional rights, together with punitive damages, attorney's fees and costs. He appeals from the trial court's judgment dismissing his complaint for failure to state a claim on which relief may be granted.

## I. Standard of Review

■■■

A motion to dismiss a complaint for failure to state a claim upon which relief may be granted tests the legal sufficiency of the pleading. *Evans v. Cameron*, 121 Wis. 2d 421, 426, 360 N.W.2d 25, 28 (1985). Because the question presented is one of law, we review the trial court's decision de novo. *Williams v. Security Sav. & Loan Ass'n*, 120 Wis. 2d 480, 482, 355

Secretary of the Department of Revenue, was "unhappy . . . because of the [pension] [c]ase."

N.W.2d 370, 372 (Ct. App. 1984). And while we take the pleaded facts and all reasonable inferences from those facts as true, "legal conclusions and unreasonable inferences need not be accepted." *Morgan v. Pennsylvania Gen. Ins. Co.*, 87 Wis. 2d 723, 731, 275 N.W.2d 660, 664 (1979). Because pleadings are to be liberally construed, "[a] complaint should be dismissed as legally insufficient only if it is quite clear that under no conditions can the plaintiff recover" based on the facts (and inferences) alleged. *Williams*, 120 Wis. 2d at 482-83, 355 N.W.2d at 372 (footnote omitted). This is such a case.

## II.   Bartley's Contract Claim

The trial court ruled that Bartley's attempt to state a cause of action against the governor for breach of contract failed for lack of consideration.[4]

---

[4] We note at the outset that the inflammatory tone of Bartley's brief does little to advance his legal arguments. Among other things, he accuses the governor and/or his counsel of "deliberately conceal[ing]" facts and "deliberately misrepresent[ing]" the claims in the case to this court, and generally engaging in "sleazy 'advocacy'" and "adulterat[ing] the truth." At one point he states that "[t]he Governor and his lawyer have a bad habit of deliberately concealing relevant law." At another, he impugns the quality of the governor's legal education, characterizes his arguments as "inane," "bogus" and "outrage[ous]," and states that he "despairs over the low quality of advocacy here."

No one escapes the vitriol. Using a "storm-trooper" analogy, Bartley claims that the trial court's decision "makes hash" out of the law and that the judge "ignored" and failed to come to grips with his arguments in the case. He accuses Musolf of "very serious impropriety," and dismisses the person who was appointed to the commission in Bartley's stead as a "rookie lawyer." We can only speculate how we ourselves will be charac-

Bartley claims that the fact that he gave up his part-time law practice to accept the initial one-year appointment constitutes adequate consideration for the governor's "promise" to renominate him to a full six-year term the following year. The trial court concluded that because state law flatly prohibits full-time commissioners from engaging in private employment, Bartley had not promised to do anything in exchange for the governor's alleged promise that he was not otherwise required to do under state law.

Bartley does not dispute the general rule that a promise to do something the promisor is already legally bound to do, or the performance of an existing legal obligation, does not constitute sufficient consideration for a contract. *Holcomb v. United States*, 622 F.2d 937, 941 (7th Cir. 1980).[5] He argues, however, that the rule is inapplicable because he made his "deal" with the governor in December 1991, *before* accepting the interim appointment. Thus, says Bartley, he had a legal right to practice law at the time the "contract" was made and gave up that right a few weeks later, on January 1, 1992, when he took office pursuant to that appointment. He maintains that we may not look past the December date in analyzing whether consideration existed for the alleged agreement. We disagree.

---

terized should Bartley seek review of our decision in the supreme court.

[5] The rule, which has been described as " 'the traditional and rigorously logical view,' " is that obtaining in the " 'majority of courts,' " state and federal. *General Intermodal Logistics Corp. v. Mainstream Shipyards & Supply, Inc.*, 748 F.2d 1071, 1075 (5th Cir. 1984) (quoting JOHN D. CALAMARI & JOSEPH M. PERILLO, CONTRACTS 149 (2d ed. 1977)). *See also* 17A AM. JUR. 2d *Contracts* § 144 (1991).

As noted above, the part-time commissioner position Bartley occupied in the years before his purported agreement with the governor permitted him to practice law "on the side." As he alleges in his complaint, however, the two part-time positions on the commission were abolished by the legislature in mid-1991, and the three full-time positions that remained carried a prohibition against any outside employment.

That left Bartley with only two choices: to leave the commission or to seek appointment to one of the remaining full-time positions that had fortuitously opened up when an incumbent resigned. As a matter of law, if he wanted to continue on the commission he could do so only upon relinquishing his law practice, and he elected to do so, seeking and accepting nomination and appointment for the year remaining on the resigning commissioner's term. The requirement that he give up his practice was not one imposed by the governor—the person Bartley claims was the only other party to his "contract"; it was imposed by the legislation creating the commission and defining its membership and powers. Knowing that neither he nor anyone else could serve on the commission and still maintain a law practice, Bartley took the job.

The trial court could properly conclude on these facts that his attempt to assert a breach-of-contract claim against the governor failed for lack of consideration.

Aside from traditional precepts of contract law, Bartley's claim is groundless because it assumes that appointment to public office is something a governor can barter or contract away. It is true that English common law considered public office as an "incorporeal hereditament grantable by the Crown in which the

holder acquired and had an estate." *State ex rel. Bonner v. District Court*, 206 P.2d 166, 169 (Mont. 1949). *See* 63A AM. JUR. 2d *Public Officers and Employees* § 8 (1984). But that has never been so in the United States.

> [A]ppointments to offices of public trust have never been considered as contracts which the sovereign authority was not competent to rescind or modify.
>     . . . .
>     . . . Public offices are not created by contract . . . . [They] are created by public laws, for public political purposes, and filled by appointments made in the exercise of political power.

*Trustees of Dartmouth College v. Woodward*, 17 U.S. 518, 611-12, 616 (1819).

The very nature of the concept of public office and its relation to the public is inconsistent with either a property or a contract right in the office. *Mecham v. Gordon*, 751 P.2d 957, 962 (Ariz. 1988). The office belongs to the people, not to the officeholder or the appointing authority. *See Bonner*, 206 P.2d at 169. And that is why the law invalidates any "bargain" made by a public official to appoint a particular person to office.

> " 'It is the duty of the officer having a power of appointing' . . . 'to make the best appointment in his power according to his judgment at the time when he makes the appointment. The public have a right to demand this. . . . [T]he public good would be injured if a promise to make an appointment were held to be legally binding, so as to control the exercise of that judgment which the appointing officer ought to exercise when he makes an appointment. . . . [T]he right of appointment is not the property of the appointing officer. And he has no right to barter it, or to dispose of it. It is merely a

political power entrusted to him, to be exercised, not to be sold.' "

*Hall v. Pierce*, 307 P.2d 292, 299-300 (Or. 1957) (quoting MECHEM'S PUBLIC OFFICES AND OFFICERS, § 350 (1890)) (emphasis omitted; quoted source omitted). The *Hall* court went on to conclude:

> We do not believe that a public officer, who has authority to appoint another to a salaried berth, can enter into a bargain . . . whereby he will appoint [one person] and no other.

*Id.* at 301.

We conclude, therefore, that Bartley's claim that he had a binding contract with Thompson to appoint him to a full term on the Wisconsin Tax Appeals Commission has no basis in law.[6]

## III.   The Constitutional Claim

Bartley's complaint alleges that the governor's failure to renominate him to the commission in the wake of the pension case decisions constituted a "malicious[ ]" interference with his right to free speech in the "performance of his lawful duties as a commissioner" guaranteed him by the First Amendment to the United States Constitution. The trial court, citing *Pickering v. Board of Educ.*, 391 U.S. 563 (1968), ruled that the allegations failed to state a First Amendment claim because in his decisions in the pension case Bartley was speaking not as a "citizen" but in a governmental capacity. Bartley contends that the trial court misread

---

[6] Because we so hold, we do not address the governor's several alternative arguments for dismissal of Bartley's breach of contract claims.

*Pickering* because that case contains no such "citizen-speech" requirement.

■

Even accepting the truth of Bartley's allegation that he was not renominated to the commission because of his participation in the pension case decisions, we nonetheless conclude that he has not stated a First Amendment claim.

In *Pickering*, a teacher was fired after sending a letter to a local newspaper criticizing a school board proposal to increase taxes to build two new schools. The Supreme Court reversed lower court decisions holding that the teacher had failed to state a First Amendment claim in challenging his dismissal, concluding that "teachers may [not] constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy *as citizens* to comment on matters of public interest in connection with the operation of the public schools in which they work . . . ." *Id.* at 568 (emphasis added). Recognizing that the government, as an employer, "has interests . . . in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general," the Court attempted to strike a balance "between the interests of the teacher, *as a citizen*, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* (emphasis added).

Bartley argues that the Court's references to the public employee speaking "as a citizen" were simply descriptions of the facts of the case and do not carry any legal significance. At least two federal appellate courts have decided otherwise.

In *Egger v. Phillips*, 710 F.2d 292, 316 (7th Cir.) (en banc), *cert. denied*, 464 U.S. 918 (1983), the Seventh Circuit held that "the content of an employee's speech naturally affects his superior's assessment of him and forms the basis of personnel decisions." Egger was an FBI agent who came to believe during the course of an investigation that one of his colleagues had acted improperly, and reported to his superiors that the other agent had committed perjury and accepted bribes. When Egger was transferred for making the accusations, he sued his superiors claiming, among other things, that the transfer violated his free speech rights. In affirming the dismissal of Egger's claim, the court recognized that his accusations against his co-employee "implicated [his] interests as a concerned citizen." *Id.* at 317. The court went on to state, however, that because Egger's actions were undertaken in the course of his work on the investigation and represented "professional" activities, they also "implicate[d] internal agency concerns," which eventually tipped the *Pickering* balance in favor of the defendant employer. Egger's lawsuit was dismissed. *Id.* at 317-18.

The second case, *Marquez v. Turnock*, 967 F.2d 1175 (7th Cir. 1992), involved a state employee, Marquez, who claimed he was fired from his position at Illinois Emergency Medical Services (EMS) for criticizing the manner in which his supervisor ran the office. The district court directed a verdict dismissing the action, concluding that because Marquez was not speaking "as a citizen" and his statements did not involve a "matter of public concern," he had not stated a First Amendment claim. *Id.* at 1177. The court of appeals affirmed, noting that while it was difficult to accept that Marquez was not speaking on a matter of public concern in the matter, "the district court's con-

clusion that [his] statements were not made 'as a citizen' seems well-taken." *Id.* at 1178.

> As noted, virtually all of Marquez's criticisms . . . stemmed from [a] disagreement about how violations of the EMS regulations should be handled. In speaking on this issue, Marquez did not act simply as a member of the general public; it was his *job* to investigate such violations and make recommendations as to the appropriate response.

*Id.*[7]

While the *Marquez* court's statement is *dictum* in that it was not essential to its decision in the case,[8] we think the reasoning is sound. As in *Marquez*, it was

---

[7] In his brief, Bartley cites *Burkes v. Klauser*, 185 Wis. 2d 308, 517 N.W.2d 503 (1994), *cert. denied,* 115 S. Ct. 1102 (1995), in support of his First Amendment claim. In that case the supreme court recognized that criticisms voiced by an employee of the state investment board that the board was misusing public funds enjoyed First Amendment protection as "speech . . . [on] a matter of public concern." *Id.* at 334-35, 344, 517 N.W.2d at 514, 518. Whether Bartley's decisions may be considered such speech in the context of a First Amendment claim—a point we need not and do not decide on this appeal—Bartley, unlike the plaintiff in *Burkes*, was not speaking as a citizen/public employee on possible misfeasance by a public agency. He was, as were the plaintiffs in *Egger* and *Marquez*, simply doing what his position required him to do: deciding contested cases brought before the quasi-judicial body of which he was a member. *Burkes* does not advance Bartley's argument on the constitutional issue.

[8] The court concluded that, to the extent Marquez may have had a protected interest in making his statements, that interest was outweighed—in the *Pickering* balance—by the state's interest in the efficient functioning of the office. *Marquez v. Turnock*, 967 F.2d 1175, 1179 (7th Cir. 1992).

Bartley's *job* to participate in the decision of cases coming before the commission and, when assigned to do so, to write opinions announcing the decisions. We have concluded that Bartley's allegations that he had a contract for renomination to the commission fail to state a claim. And if we were to hold, as Bartley urges, that the governor's decision not to renominate him for another term is constitutionally impermissible, no appointed official could be dismissed, or denied reappointment, on the basis of his or her performance in the job.

While some might not find great public merit in the decision to deny Bartley renomination to the commission, the conclusion is inescapable that the governor is possessed of the wholly discretionary power to nominate persons to appointive positions in government. In making his own judgment on Bartley's application for reappointment, the governor was within his rights to consider the decisions written by Bartley, the soundness of Bartley's legal reasoning and the quality of his legal conclusions as expressed in those decisions. In his brief, the governor aptly paraphrases *Egger*: "[Bartley] was simply doing his job as a [tax appeals commissioner], and the quality of that work was something [the governor] routinely had to assess. [The governor] necessarily evaluated the soundness of [Bartley's] work regarding [the pension case] in this professional environment." *Egger*, 710 F.2d at 318. That others might disagree with Thompson's evaluation of Bartley does not diminish the discretion possessed by the governor to appoint, or not to appoint, specific persons to public office.

The worst that can be said about the governor's action, if in fact he declined to renominate Bartley because of his decisions in the pension case, is that it was politically motivated. And while the attachments

340

to Bartley's complaint indicate that he enjoys wide-spread respect as an attorney and government official, nothing in the statutes requires that respected—or even competent—persons be appointed or reappointed to high state office or that gubernatorial nominations or renominations to such positions be free of political considerations. Nomination to offices such as tax appeals commissioner are "political" in that they are wholly discretionary with the governor, and "[p]olitics," as Mr. Dooley said nearly a century ago, "ain't beanbag."[9]

## IV. Conspiracy

Bartley's complaint characterizes the statements made to him by Marion, Reuter and Musolf as "constitut[ing] threats . . . that he would lose his job as commissioner if he persisted in [his] ruling[s] in . . . the Pension Case . . . ." He claims these "threats" were made in the course of a conspiracy among the governor, his staff and Musolf and "were maliciously and conspiratorially designed" to "prevent or hinder Bartley in the performance of his lawful duties, in violation of § 134.01 Wis. Stats."[10]

---

[9] FINLEY PETER DUNNE, MR. DOOLEY'S OPINIONS, R. H. RUSSEL (1901).

[10] Section 134.01, STATS., makes it a crime for any two or more persons to "combine, associate, agree, mutually undertake or concert together for the purpose of wilfully or maliciously injuring another in his or her reputation, trade, business or profession . . . or for the purpose of maliciously compelling another to do or perform any act against his or her will, or preventing or hindering another from doing or performing any lawful act . . . ."

Bartley's complaint also alleged a conspiracy to "influence the outcome of the Pension Case in violation of § 227.50(1), Wis.

For a conspiracy to exist, there must be, at a minimum, "facts that show some agreement, explicit or otherwise, between the alleged conspirators on the common end sought and some cooperation toward the attainment of that end." *Augustine v. Anti-Defamation League of B'nai B'rith,* 75 Wis. 2d 207, 216, 249 N.W.2d 547, 552 (1977). It is not enough that the defendants may have acted in concert or with a common goal. *Sparkman v. McFarlin,* 601 F.2d 261, 268 (7th Cir. 1979) (en banc). It is true, as Bartley argues, that the rules of civil procedure require a plaintiff to plead only "[a] short and plain statement of the claim . . . showing that the pleader is entitled to relief." Section 802.02(1)(a), STATS. Even with "notice pleading," however, "a general allegation of conspiracy, without a statement of the facts constituting that conspiracy, is only an allegation of a legal conclusion and is insufficient to constitute a cause of action." *McCleneghan v. Union Stock Yards Co.,* 298 F.2d 659, 663 (8th Cir.

Stats.," which prohibits parties, interested agency officials or other persons with a substantial interest in a contested case being heard before an agency from making *ex parte* threats, "offer[s] of reward," or communications on the merits of the case, to any agency decisionmaker. While isolated portions of Bartley's brief to this court suggest a conspiracy claim—he states at one point, for example, that "the Governor's office . . . was itself very active in its attempts to influence Bartley and the outcome of the pension case" and, at another, that "Musolf and the Governor were acting in concert in trying to get Bartley to throw the pension case"—he never develops a legal argument on the issue, and we therefore need not consider it. *See Polan v. DOR,* 147 Wis. 2d 648, 660, 433 N.W.2d 640, 645 (Ct. App. 1988) (court of appeals declines to review issues where arguments are not developed themes reflecting legal reasoning but are supported by only general statements).

1962). *See Cairo v. Skow*, 510 F. Supp. 201, 206 (E.D. Wis. 1981).

The trial court concluded that because the governor, Reuter and Marion were all members of a single governmental entity, they could not, as a matter of law, engage in a conspiracy.[11] And, concluding that there was nothing in the statements Musolf allegedly made to Bartley to support a reasonable inference that Musolf was acting "in concert with the Governor," the court rejected Bartley's argument that the involvement of Musolf as an "outside actor" was sufficient to take the case out of the "intracorporate conspiracy" rule of *Ford Motor Co. v. Lyons*, 137 Wis. 2d 397, 405 N.W.2d 354 (Ct. App. 1987), and similar cases.

On appeal, Bartley appears to concede that the governor and his staff, being part of the same office or entity, cannot be guilty of a conspiracy in the pursuit of a common goal. Instead, he grounds his conspiracy argument on his assertion that Musolf's alleged remarks to Bartley, "How can you do this when your reappointment is up?" and "You're making a laughing-stock of the commission," are sufficient, in and of themselves, to support the inference that the governor had "pressured" Musolf to call Bartley and threaten non-reappointment in order to get him to change his rulings in the pension case. As a result, Bartley argues

---

[11] *See Ford Motor Co. v. Lyons*, 137 Wis. 2d 397, 426-31, 405 N.W.2d 354, 366-68 (Ct. App. 1987) (section 134.01, STATS., stating the rule that parties, such as a parent corporation and its subsidiaries, who have a unity of interest and common objectives, cannot be guilty of a conspiracy as a matter of law). We see no reason why the rule would not be equally applicable to defendants within a single governmental unit such as the executive office. *See, e.g., Cromley v. Board of Educ.*, 699 F. Supp. 1283, 1291-92 (N.D. Ill. 1988).

that he has adequately pleaded a claim that the governor and Musolf conspired to obstruct and hinder him in the performance of his duties as a tax appeals commissioner.

To get from Musolf's remark to a Thompson/Musolf conspiracy, we must first infer that the remark constituted a "threat" to deny him renomination because of his written decisions and, second, that it was made at the governor's instigation. Bartley's argument simply assumes the former and asks us to infer the latter because: (1) only the governor, not Musolf, possesses the power to nominate persons to the commission; (2) Musolf could not have known "that Bartley's renomination was in jeopardy except through contact with the Governor"; and (3) the only "logical motivation" for Musolf's call would be "great" and "overwhelming" pressure from the governor because the call was allegedly a violation of "the canons of ethics"—a prohibited *ex parte* contact within the meaning of § 227.50(1)(a), STATS.[12] We are unwilling to make such a leap.

There is nothing in Musolf's statement, or any of the circumstances that might reasonably be inferred from it, that Governor Thompson was even aware that it was made, much less that the governor and Musolf had agreed that it should be made—or that the governor exerted, in Bartley's words, "great" and

[12] As indicated, *supra*, note 10, the statute prohibits interested parties from threatening or offering rewards to agency decisionmakers hearing contested cases.

Bartley also asserts that Musolf's "laughingstock" remark is additional evidence of the pressure put on him by the governor to make the call: that "Musolf was being subjected to the brunt of the Governor's unhappiness with Bartley." The assertion adds nothing of substance to his arguments.

"overwhelming" pressure on Musolf to make the call to Bartley. Bartley does not ask us to draw a reasonable inference in this respect; he asks us to speculate. We think the same is true with respect to Musolf's reference to Bartley's appointment being "up." Bartley argues that the inference from the remark is that Musolf was telling him, as the governor's messenger, that his renomination was in jeopardy because of the governor's "unhappiness" with his part in the rulings in the pension case.

It would be well known to Musolf, as chairman of the commission, not only that Bartley's initial term was ending but also that the pension case rulings were controversial, to say the least, in state government circles. Here, too, we do not see how it reasonably may be inferred from Musolf's unadorned remark that Bartley's appointment was "up" that he and the governor were engaged in a conspiracy of the type Bartley suggests.

■

Even if Bartley's allegations could be considered as raising a reasonable inference that the governor had communicated to Musolf some degree of unhappiness with Bartley's actions in the pension case, Bartley has not persuaded us that those allegations reasonably give rise to an inference that the governor and Musolf had entered into an agreement or combination to obstruct Bartley in the performance of his duties on the commission. "Mere similarity of conduct among various persons and the fact that they may have associated with each other, and may have assembled together and discussed common aims and interests, does not necessarily establish the existence of a conspiracy." Wis J I—Civil 2800 (1995).

The trial court did not err in dismissing Bartley's complaint.

*By the Court.*—Judgment affirmed.